**STATE of Missouri, Plaintiff–Respondent,**

v.

**Roger Lee FEARS, Defendant–Appellant.**

No. 73200.

Supreme Court of Missouri, En Banc.

Feb. 7, 1991.

---

**24.** *Jacobs v. Danciger*, 344 Mo. 1042, 130 S.W.2d 588, 592 (1939); *Kelsey v. Kelsey*, 329 S.W.2d 272, 274 (Mo.App.1959).

Ronald D. White, Joseph W. Rigler, J. Max Price, Rolla, for defendant-appellant.

William L. Webster, Atty. Gen., Frank A. Jung, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HIGGINS, Judge.

Roger Lee Fears, charged with murder in the second degree, § 565.021, RSMo 1986, was convicted by a jury of voluntary manslaughter, § 565.023, RSMo 1986. The jury assessed punishment at imprisonment for a term of twelve years; the court entered judgment accordingly. Fears challenges the sufficiency of evidence to support his conviction and questions the trial court's appointment of the prosecuting attorney from a neighboring county as a special assistant prosecuting attorney in this case. Affirmed.

Leroy Dunn drove a school bus for the Southern Reynolds County R–II School District. Fears, a maintenance supervisor in a local lead mine, had two sons attending the R–II School who rode Dunn's bus and who were involved in a fight on the bus on December 10, 1987. The boys' principal offered them a choice of corporal punishment (one "swat") or a three-day suspension from riding the bus. Upon learning of the punishment options, Fears set out to discuss the matter with Dunn.

Fears, in his truck, met Dunn, in his bus, at an intersection known as Corridon/Reyn-

olds. Fears waved at Dunn. Dunn motioned Fears over to the bus. Fears parked his truck and walked over to the bus. Dunn asked "What can I do for you?" Fears replied, "I don't think that treating my kids unfair because you have a personal grudge against me is the way to handle situations on the school bus." Dunn exited the bus and asked Fears what made him think Dunn was treating Fears' children unjustly. Fears answered by telling Dunn that other parents and children had told him Dunn was not being fair to his children. The discussion "bounced back and forth" until it became "heated." Dunn gave Fears a shove, and, according to Fears, the argument continued:

A. When we was talking we was using our fingers pointing it at each other and he took his finger and went to poking it in my chest.

Q. All right. You're indicating a poke in the center of your chest?

A. Yes, sir.

Q. Mr. Dunn did that, is that your testimony?

A. Yes, sir.

Q. As he did that, what, if anything, did you do?

A. After he poked me about five or six times, I don't know the exact count, I put my finger back on his chest.

Q. Okay, and then what happened?

A. And we went on talking and a couple of times I was just, seen I was not getting anywhere as far as solving my situation and I had turned around to walk away from him.

Q. Then what happened?

A. He kept trying to talk to me and I would just, just almost make a complete circle and I turned away two or three times. I believe it was three times I started to walk off.

Q. All right, sir. Did you ever double up your fist or did Mr. Dunn ever double up his fist?

A. Mr. Dunn did double up his fist.

Q. And what were you doing at that time?

A. I was standing facing him.

Q. Where were your hands at that time?

A. Back in my pockets.

Q. And which fist did he double up?

A. His right.

Q. And what, if anything, did he do then?

A. He became angry and he had his left arm leaned up against the school bus and he just kindly pushed himself off the school bus and reared his right fist back and come, come at me to hit me.

Q. And what, if anything, did you do?

A. I threw my arm up just like this and just brought my hand from my pocket with my fist doubled up and shoved out.

Q. Did your fist touch his body?

A. Yes, sir.

Q. Where?

A. I believe it would have hit right in this area here.

Q. All right. What, if anything, happened at that point?

A. At that time he just looked at me kind of funny and backed just like he was leaning and he just fell backwards.

Q. What did you do then?

A. When he fell he didn't get up and I just, I just couldn't see him going down and I said, come on Leroy, get up, you're not hurt that bad.

Q. Did he get up?

A. No, sir.

By the time an ambulance arrived, Dunn had died from a blow to the posterior surface of his head. An autopsy revealed that Dunn had a laceration on his upper lip and that his death was caused by a fracture to the back of his skull, which caused hemorrhage around Dunn's brain.

Fears contends the trial court erred in submitting voluntary manslaughter to the jury asserting he was either guilty of murder in the second degree or of nothing at all because no facts supported submission of the lesser-included offense. Upon a review for sufficiency of evidence, the reviewing court takes the evidence in the light most favorable to the verdict. *State v. Rodden*, 728 S.W.2d 212, 213 (Mo. banc 1987). The court does not weigh the evi-

dence but determines whether it was sufficient to permit reasonable persons to have found Fears guilty. *State v. Porter*, 640 S.W.2d 125, 126 (Mo.1982).

Fears argues that the State proved neither the cause nor the corpus delicti of Dunn's homicide. The evidence refutes both contentions.

■ The coroner's testimony verifying Dunn's lacerated upper lip and fractured skull, coupled with Fears' testimony that he hit Dunn and that Dunn "looked at [him] kind of funny," fell to the ground and did not get up, provided sufficient evidence for the jury to find that Fears' action was the proximate cause of Dunn's death.

■ The corpus delicti in a homicide case consists of the death of the victim and the criminal agency of someone other than the victim serving as the cause of the death. *State v. Lusk*, 452 S.W.2d 219, 221 (Mo. 1970); *State v. Prier*, 645 S.W.2d 747, 749 (Mo.App.1983). Fears contests the sufficiency of the evidence of criminal agency and argues the corpus delicti must be established prior to the admission of Fears' extrajudicial statements into evidence. *State v. Howard*, 738 S.W.2d 500 (Mo.App. 1987), *quoting State v. McQuinn*, 361 Mo. 631, 235 S.W.2d 396, 397 (1951), recognized the general rule "that confessions of a crime not made in open court or before a committing magistrate and without proof aliunde that a crime has been committed will not sustain a conviction" but held that evidence corroborating a defendant's confession is sufficient to admit a confession over an objection of failure to prove corpus delicti. *Howard* at 504. The corroborating evidence may be circumstantial, and if so, the facts and circumstances establishing guilt must be consistent with each other and consistent with the hypothesis of Fears' guilt. The circumstances, however, "need not be absolutely conclusive of guilt or demonstrate impossibility of innocence, and the mere existence of other possible hypotheses is not enough to remove the case from the jury." *State v. Payne*, 612 S.W.2d 353, 354 (Mo.App.1980).

The evidence in this case showed that Fears said earlier that day to a coworker, in the context of dealing with his children's problems at school, that "it was time he was going to have to skin some heads." Witnesses saw Fears and Dunn standing next to the bus having a discussion one minute and Dunn lying on the ground beside Fears a few minutes later. An autopsy showed Dunn had a lacerated upper lip and a laceration and abrasion on the back of his head directly above the skull fracture that caused a deadly hemorrhage. The aggregation of this evidence, corroborating Fears' statement to the police after the incident that he hit Dunn, who fell backwards and did not get up, was sufficient to support admission of Fears' extrajudicial statements and to permit a finding that Dunn "died as a result of an assault which was the criminal agency of someone other than the deceased." *Howard*, 738 S.W.2d at 502. Fears' reliance on *State v. May*, 689 S.W.2d 732 (Mo.App.1985), to support his argument fails because the evidence in this case established that Fears struck Dunn and thus caused Dunn's death. In *May*, no evidence existed, circumstantial or direct, to show that defendant struck the victim.

■ Fears argues that the State's proof of prior intent to cause serious physical injury negated its proof of sudden passion; hence, the verdict is unsupported by substantial evidence. Fears actually challenges the validity of section 565.023, which requires both prior intent and sudden passion for a finding of voluntary manslaughter.

The evidence refutes Fears' logic. A history of personal grudges existed between Fears and Dunn. Fears told a coworker it was time to "skin some heads." Fears immediately set out to find Dunn after learning of his boys' punishment. The conversation between Fears and Dunn escalated into Dunn pushing Fears. Both men began waving fingers at each other and poking at the other's chest. Fears began "to get angry." Dunn called Fears' children "liars." Fears called Dunn a liar. Dunn circled Fears to prevent his leaving the argument. Dunn took a swing at Fears. Fears blocked the swing and threw

a counter punch. The record reflects substantial evidence of Fears' prior intent to cause serious physical injury to Dunn, which under the influence of Dunn's provocation, developed into a reactional striking of Dunn. The prior intent and sudden passion elements of voluntary manslaughter are not inconsistent; rather, the former is the actor's calculated mental state prior to the act, while the latter is an unexpected force, motivated by another's provocation, that subdues the prior mental state momentarily in causing a responsive act. *See State v. Hunter*, 444 S.W.2d 392, 394–95 (Mo.1969).

■ Fears also challenges the submission of the voluntary manslaughter instruction on the grounds that he did not inject the issue of sudden passion, that the State failed to prove beyond a reasonable doubt Fears' intent to cause Dunn serious physical injury, and that the State failed to prove beyond a reasonable doubt that Fears did not act in lawful self defense. As previously discussed, sufficient evidence existed to acquit Fears of second degree murder and to convict him of voluntary manslaughter; accordingly, the trial court was justified in submitting the voluntary manslaughter instruction to the jury. *See State v. Tate*, 733 S.W.2d 45, 48 (Mo. App.1987).

■ The contention that Fears did not inject the issue of sudden passion fails because of Fears' testimony regarding the discussion with Dunn and its escalation into a fight. The term "sudden passion" means "passion directly caused by and arising out of provocation by the victim ... which passion arises at the time of the offense and is not solely the result of former provocation." § 565.002(7). "Adequate cause," another element of voluntary manslaughter, means "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self control." § 565.002(1). In *State v. Simmons*, 751 S.W.2d 85 (Mo.App. 1988), the court stated:

> To be "adequate," the provocation must be of a nature calculated to inflame the passions of the ordinary, reasonable, temperate person.... [T]here must be a sudden, unexpected encounter or provocation tending to excite the passion beyond control. Passion may be rage or anger, or terror, but it must be so extreme that for the moment, the action is being directed by passion, not reason. R. Perkins, *Criminal Law*, 66 (1969). In addition, the offense must have been done in a sudden passion and not after there has been time for the passion to cool. Furthermore, while words, gestures or other actions may give rise to provocation it was the rule at common law and the general long-standing rule in Missouri that words, no matter how opprobrious or insulting are not sufficient to show "adequate provocation."

*Id.* at 91. The court also referred to the long line of Missouri decisions, beginning with *State v. Starr*, 38 Mo. 270 (1866), holding that at a minimum the provocation must at least involve a "pulling" or "tweaking" of the nose. *See* Hunvald, *Criminal Law in Missouri*, 27 Mo.L.Rev. 1, 5, n. 19 (1962).

Again, the facts show not only an exchange of opprobrious words between Dunn and Fears but a shove from Dunn, Dunn's waving of his finger in Fears' face, several pokes to Fears' chest by Dunn, Fears' admission that he became "angry," and an attempted punch by Dunn. The aggregate of insulting words, offensive gestures and physical contacts that occurred during this encounter was more egregious than "nose tweaking" or "filliping upon the forehead," *id.* at 6, sufficient to put Fears in fear of serious bodily harm, carried out in a time span insufficient for Fears' anger to cool, and sufficient for reasonable persons to have found that Fears acted under "sudden passion."

■ Fears' insistence that the State failed to prove beyond a reasonable doubt Fears' intent to cause Dunn serious physical injury fails in light of the evidence showing their long standing dispute, Fears' threats regarding "skin[ning] some heads," Fears' immediate pursuit of Dunn after learning of his children's punishment,

Fears' confrontation of Dunn with allegations of Dunn's unfair treatment of Fears' children and of Dunn's lying, and Fears' poking Dunn's chest. This evidence was sufficient for the jury to believe beyond a reasonable doubt that Fears intended to cause Dunn serious physical injury. *See State v. Hills*, 645 S.W.2d 57, 59 (Mo.App. 1982). Fears' challenge to the State's proof beyond a reasonable doubt that Fears did not act in lawful self defense fails for the same reason: substantial evidence exists from which the jury could find Fears acted under sudden passion rather than in self defense. *See State v. Rodney*, 760 S.W.2d 500, 504 (Mo.App.1988).

■ Fears contends the trial court erred in entering its judgment because the court had no authority to appoint Randall Head, the Iron County Prosecuting Attorney, as a special assistant prosecutor in this case. The appointment of a special prosecuting attorney is a matter within the discretion of the trial court. *See Wilson v. State*, 755 S.W.2d 324, 327 (Mo.App.1988). Missouri statutes provide two means of appointing special prosecutors: under section 56.110, RSMo 1986, due to a prosecutor's conflict of interest, or under section 27.030, RSMo 1986, when the governor requests the attorney general or an assistant attorney general to serve as a special prosecutor. Although neither situation existed in this case, this Court knows of no authority suggesting the appointment of a prosecuting attorney from a neighboring county to assist the disinterested and properly elected local prosecuting attorney merits reversal of the case for retrial by "a proper prosecutor." "[A] proper prosecutor," the Reynolds County Prosecuting Attorney, has already accomplished that purpose. Fears cites cases dealing with private counsel assisting a prosecutor; those cases are inapposite. *See State v. Bockman*, 251 S.W.2d 607 (Mo.1952), and *State v. Harrington*, 534 S.W.2d 44 (Mo. banc 1976). The only defect suggested in this appointment was that Head did not reside in Reynolds County. This Court does not read Chapter 56, RSMo 1986, so narrowly as to hold the suggested defect an abuse of discretion. Because of Fears' failure to articulate any

prejudice created by Head's participation in this prosecution, and because this appointment is consistent with the policies behind the rule against prosecution by a private prosecutor, the trial court did not abuse its discretion in appointing Head as a special assistant prosecutor.

Judgment affirmed.

BLACKMAR, C.J., ROBERTSON, RENDLEN and COVINGTON, JJ., and SHANGLER and KENNEDY, Special Judges, concur.

BILLINGS and HOLSTEIN, JJ., not sitting.