STATE of Missouri, Respondent,

v.

Paul HAHN, Appellant.

No. WD 57654.

Missouri Court of Appeals,
Western District.

Submitted Sept. 7, 2000.

Decided Dec. 19, 2000.

As Modified Jan. 30, 2001.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 30, 2001.

Application for Transfer Denied March 20, 2001.

Amy M. Bartholow, Asst. Public Defender, Columbia, MO, for Appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, MO, for Respondent.

Before HOLLIGER, C.J., BRECKENRIDGE and SMART, JJ.

SMART, Judge.

Paul Hahn appeals his conviction by a Buchanan County jury of second-degree murder, § 565.021, RSMo 1994,[1] and armed criminal action, § 571.015. As a prior offender, Hahn was sentenced to consecutive terms of life imprisonment and twenty years on the respective counts.

---

1. 565.021 states in pertinent part:
 1. A person commits the crime of murder in the second degree if he:
 (1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; . . . .
 3. Notwithstanding section 556.046, RSMo, and section 565.025, in any charge of murder in the second degree, the jury shall be instructed on, or, in a jury-waived trial, the judge shall consider, any and all of the subdivisions in subsection 1 of this section which are supported by the evidence and requested by one of the parties or the court.

Hahn presents four points on appeal. Hahn contends the trial court erred in (1) refusing to submit to the jury an instruction on voluntary manslaughter; (2) refusing to grant Hahn's request for a mistrial when the prosecutor intentionally elicited highly prejudicial testimony of Hahn's character and prior bad acts; (3) refusing to allow the defense to present testimony to impeach the credibility of the prosecution's primary witness by wrongly labeling it "hearsay"; and (4) failing to *sua sponte* declare a mistrial when the prosecutor twice wrongly attempted to inject evidence into the trial that he could not get before the jury in any other way in an attempt to prejudice Hahn's defense.

## Factual Background

The facts are recited in a light favorable to the verdict, and based on the testimony of the state's witnesses. On the night of the murder, December 14, 1998, appellant Paul Hahn and his cousin Bobby McClain, the victim, were at the apartment of McClain's sister, Roberta Osborn, "partying" with a number of other extended-family members. There was testimony at trial that Bobby McClain and others had been drinking alcohol most of that afternoon and evening. When Roberta came home from work that evening, she found the participants in her kitchen. She noticed that there was some bickering and arguing going on among the family members, including her brother, Bobby McClain, and her cousin, the appellant, Paul Hahn. Apparently, the argument was partly the result of Bobby McClain earlier defending a man who had been physically abusive to Paul Hahn's sister. Soon a fight broke out between Paul Hahn, Bobby McClain, and J.R. McClain (another cousin) during which Hahn struck Bobby and J.R. with a baseball bat. The bat was wrestled away from Hahn by another family member, Larry McClain, and by Stacey Rodgers, Roberta's fiancé, who also lived at the apartment. Roberta went to another apartment in the building to borrow a telephone.

When Roberta came back to her apartment, she told everyone she had called the police (which was untrue) and that everyone needed to leave her apartment. J.R. and Bobby McClain left the apartment and Roberta followed them downstairs. Paul Hahn also left the apartment and went to another apartment in the same building where he had been staying with another cousin, Brian McClain and his wife. As J.R. and Bobby started to walk away from the building, Roberta told them that Bobby's mother, Joan, was on her way over to pick them up. Roberta let J.R. and Bobby return to her apartment to wait for the ride. When Joan arrived, she went upstairs to Roberta's apartment to talk to J.R. and Bobby. Rebecca Osborn, Bobby's sister, was with Joan and she went into the apartment as well. After just a few minutes, Rebecca went back down and outside to smoke a cigarette. When she went back into the building, Rebecca saw Paul Hahn leaving his apartment and she told him not to go upstairs because J.R. and Bobby McClain were still there. Hahn uttered a threat against McClain and ran up the stairs. She ran after him.

As Joan, Bobby, and J.R. were heading for the door of Roberta's apartment to leave, Roberta saw the front door opening. She saw Hahn in the doorway and told him to "just leave" and that he could come back later. Assuming that he had left, Roberta turned away from him to talk to Joan. They all started walking toward the door, when Hahn lifted his shirt and pulled a butcher knife out of his waistband. Roberta yelled "Paulie has got a knife." Hahn stabbed McClain in the chest. Roberta testified at trial that she heard Hahn say just before stabbing McClain: "The little son of a bitch is going to get what he deserves."

Some of the state witnesses testified at trial that they saw Paul Hahn twist or turn the knife before he pulled it out of McClain's chest. One of the witnesses testified that she heard Hahn say as he

stabbed McClain, "Run your mouth now, punk." None of the state's witnesses heard McClain say anything to Hahn immediately prior to the stabbing. Nor did they see him run at, jump, or make any aggressive move toward Hahn. However, one witness, Roger Ricker, testified in behalf of Hahn that as Paul Hahn came through the door, Ricker saw McClain run toward Hahn, jump on him and knock him to the ground.

After the stabbing, Hahn ran back downstairs to his apartment. Medical personnel found Bobby lying on the floor, alive but unresponsive, with a faint pulse. He died at the hospital of massive internal bleeding as a result of his inferior vena cava vein being cut. The police did not find Hahn at his apartment. He was arrested at approximately 3:00 a.m. the next morning at another address in St. Joseph. A butcher knife was found several yards from the apartment building by police and a palm print taken from the blade matched Hahn's palm print. The knife also tested positive for human blood.

On July 9, 1999, the jury found Paul Hahn guilty of second-degree murder and armed criminal action in the death of Bobby McClain. He is appealing that conviction.

## Voluntary Manslaughter

In his first point on appeal, Hahn contends that the trial court erred in refusing to instruct the jury on voluntary manslaughter because there was a basis for the

jury to acquit Hahn of second degree murder and find him guilty of the lesser included offense of voluntary manslaughter.[2] Both voluntary and involuntary manslaughter are lesser-included offenses of second degree murder,[3] the charge on which Hahn was convicted. The jury *was* given an instruction for involuntary manslaughter.

## Standard of Review

A trial court is required to instruct on a lesser included offense "if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court." *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996). In determining whether a defendant is entitled to a particular jury instruction, the appellate court reviews the evidence in the light most favorable to the defendant. *State v. Deckard*, 18 S.W.3d 495, 499 (Mo.App.2000). A defendant is entitled to an instruction that is supported by the evidence and any inferences that logically flow from the evidence. *Id.* Error results when the trial court fails to give an instruction that is required by Missouri Approved Instructions, *State v. Gilmore*, 797 S.W.2d 802, 805 (Mo.App. 1990), and such errors are *presumed* to prejudice the defendant unless it is clearly established by the state that the error did not result in prejudice. *State v. White*, 622 S.W.2d 939, 943 (Mo. banc 1981). "If there is some evidence that defendant

---

**2.** Section 565.023 defines voluntary manslaughter:

 1. A person commits the crime of **voluntary manslaughter** if he:
 (1) Causes the death of another person under circumstances that would constitute murder in the second degree under subdivision (1) of subsection 1 of section 565.021, except that he caused the death *under the influence of sudden passion arising from adequate cause*
 . . . .
 2. The defendant shall have the burden of injecting the issue of influence of sudden passion arising from adequate cause under

subdivision (1) of subsection 1 of this section. (Emphasis added).

**3.** Section 565.025.2(2) states in pertinent part:
 (2) The **lesser degree offenses of murder in the second degree** are:
 (a) Voluntary manslaughter under subdivision (1) of subsection 1 of section 565.023; and
 (b) Involuntary manslaughter under subdivision (1) of subsection 1 of section 565.024.
 3. No instruction on a lesser included offense shall be submitted unless requested by one of the parties or the court.

caused the death under the influence of sudden passion arising from adequate cause it is reversible error to fail to give a [voluntary] manslaughter instruction." *State v. Arnel*, 846 S.W.2d 245, 247 (Mo. App.1993).

### Analysis

■ "A trial court is required to instruct on a lesser included offense if the evidence, in fact or by inference, provides a basis for both an acquittal of the greater offense and a conviction of the lesser offense, and if such instruction is requested by one of the parties or the court." *Deckard*, 18 S.W.3d at 499. "[I]f there is any doubt concerning the evidence, the trial court should resolve any doubts in favor of instructing on a lower degree of the crime, leaving it to the jury to decide which of two or more grades of offense, if any, the defendant is guilty." *Id.* (quoting *State v. Johnston*, 957 S.W.2d 734, 751 (Mo. banc 1997)).

■ Accordingly, the trial court is required to give an instruction on voluntary manslaughter if there is sufficient evidence to support a finding that the defendant caused the death of the victim while under the influence of sudden passion arising from adequate cause. *Id.* at 500. "The offense must have been committed in sudden passion, and not after there has been time for the passion to cool." *Id.* "Unlike self-defense, there is no requirement that the defendant act reasonably to have his intentional killing reduced from murder to voluntary manslaughter." *Id.*

"Voluntary manslaughter" is defined in § 565.023, RSMo, as "causing the death of another person under circumstances that would constitute murder in the second degree, except that the death was caused 'under the influence of sudden passion arising from adequate cause'."

■ It is the defendant's burden to inject the issue of influence of sudden passion arising from adequate cause, and the issue of sudden passion will not be submit-

ted to the jury unless it is supported by the evidence. *State v. Redmond*, 937 S.W.2d 205, 208 (Mo. banc 1996). "Acting under the influence of sudden passion arising from adequate cause" is a special negative defense to the crime of conventional second-degree murder, and the defendant has the burden of injecting the issue. *State v. Boyd*, 913 S.W.2d 838, 842 (Mo. App.1995).

Hahn asserts that three pieces of evidence served to inject the issue of "sudden passion arising from adequate cause" at trial: (1) The testimony of defense witness Roger Ricker that when Bobby saw Paul Hahn enter the apartment door, he ran toward him, jumped and landed on Hahn, taking both of them to the ground; (2) J.R. McClain's statement to police immediately following the stabbing that Bobby had jumped into the air to take Hahn down; and (3) the testimony of defense witness, Jessie Fisk, about Bobby's demeanor that night and his belligerent attitude toward Hahn, including wanting to fight with him all night, getting in his face and calling him names.

Ricker testified that earlier in the evening Hahn and Bobby McClain were yelling at each other about "some guy" who had "smacked" Hahn's sister. Ricker said Bobby was "taking up" for the guy. He said at that point there was no physical violence between the two. Ricker testified he later went upstairs because he heard fighting going on up there between Bobby and Hahn. He said they were in the kitchen, Hahn was on the ground, and Bobby was standing beside him. Ricker said they quit fighting and Hahn went downstairs. He said Stacey told Bobby to leave and the two of them (Bobby and Stacey) started fighting. Ricker testified that then Hahn came upstairs and that's when the stabbing occurred:

Q. Describe that.

A. Paulie [Hahn] came upstairs and he had the knife and he said something and that's when Bobby took off running

across the room and jumped and that's how it happened.

* * *

Q. Okay. And do you—describe for the jury what actions you see Bobby taking, being as exact as you can.

A. He started walking towards Paulie.

Q. And after that what happened?

A. He jumped on top of—well, he like came on top of Paulie and they fell and that's when he stabbed him and he came back on the floor and laid on the ground on his side and Paulie took off running.

Q. Did you ever see—what I'm going to ask you is, was Bobby walking slowly?

A. No.

Q. What was he doing?

A. He was almost like running.

Q. I'm sorry?

A. Like running.

Q. And was he running in the direction—what direction was he running?

A. Towards Paulie.

Q. And you don't remember Bobby saying anything or you do?

A. No.

Q. Do you remember whether or not Paulie Hahn, Jr. said anything?

A. No.

Q. And did you ever see—did you ever see Bobby leave the ground or jump in any fashion or anything like that?

A. It was something like that.

Q. Well, describe—

A. He jumped.

Q. Describe the best you can, the best of your ability, to the jury what you recall seeing.

A. Whenever he came running towards Paulie is like he jumped on top of Paulie and that's how they fell.

Q. And after Bobby jumped on top of Paulie did one or both of them—were they both—did they both remain standing?

A. No, they both fell.

Q. Both of them. And is it your understanding—were you able to see when the knife hit Bobby?

A. No.

* * *

Q. After Bobby ran at Paulie they both fell to the ground. Describe for the jury what you recall seeing immediately at that point.

A. I seen Bobby like jump back and land on the ground and start holding his side and Paulie got up and took off running and J.R. went after him.

J.R. McClain, Bobby's cousin, testified at trial that he did not remember seeing Bobby jump at Hahn. He acknowledged, however, he might have told the police that Bobby charged Hahn, cursing at Hahn, but he just could not remember it at the time of trial. J.R. testified about what he recalled happening as Bobby and he headed toward the apartment door, i.e., that Bobby was the first person closest to the door; that he, J.R., was the closest person to Bobby and that he was approximately three feet behind Bobby; that immediately before the injuries, Bobby McClain did not say anything, and Paul Hahn did not say anything; that Bobby was moving toward the door; and that although J.R. was three feet behind Bobby, he never actually witnessed Hahn stabbing McClain. J.R. said he never heard anyone say, "He's got a knife, Paulie has got a knife."

Hahn also presented testimony from the booking officer, who stated that when Paul Hahn was brought in for booking, he saw that Hahn had a swollen place on his head. And, Hahn presented the expert testimony of Dr. Freedlander, a pathologist who testified that in his opinion the wound suffered by McClain would not be consistent with a wide-arm swing from an assailant; that the wound was not consistent with any upward thrusting action; and that the injury received by McClain, from his examination of the photos, the autopsy, the clothing, and the medical reports, is incon-

sistent with any type of violent twisting of a knife.

In many cases, the courts have held that the defendant was entitled to an instruction on voluntary manslaughter as a lesser-included offense of second degree murder. For example, in *Redmond*, 937 S.W.2d 205, there was a heated argument. The defendant testified that the victim confronted him in a threatening manner, and the victim reached into his pocket. The defendant believed the victim had a gun in his pocket because he had seen the gun handle. The defendant struck the victim with a baseball bat, killing him. *Id.* at 207. The Supreme Court held that the trial court erred in refusing defendant's request for a voluntary manslaughter instruction. *Id.* at 208.

In *State v. Fears*, 803 S.W.2d 605 (1991), the defendant and victim were engaged in a heated argument resulting from prior disagreements. When the defendant attempted to turn away from the argument, the victim "circled [defendant] to prevent his leaving the argument." *Fears*, 803 S.W.2d at 608. The victim pushed the defendant, and both men began waving fingers at each other and poking the other's chest until the victim eventually took a swing at the defendant. *Id.* The defendant admitted that he became "angry," and after blocking the swing, the defendant punched the victim causing him to fall to the ground. *Id.* The victim was killed by a resulting head injury. *Id.* The *Fears* court found that this physical altercation put defendant "in fear of serious bodily harm, carried out in a time span insufficient for [defendant's] anger to cool, and sufficient for reasonable persons to have found that [defendant] acted under 'sudden passion'." *Id.* at 609. The court held that sufficient evidence existed to acquit Fears of second degree murder and to convict him of voluntary manslaughter. *Id.* Specifically, the court stated:

> The aggregate of the insulting words, offensive gestures and physical contacts that occurred during this encounter was

... sufficient to put Fears in fear of serious bodily harm, carried out in a time span insufficient for Fears' anger to cool, and sufficient for reasonable persons to have found that Fears acted under "sudden passion."

*Id.* at 609.

The case before us is somewhat unique in that here it is undisputed that Hahn came upstairs with the butcher knife, cursing McClain, after he had an opportunity to cool off from the prior confrontation. If Ricker is believed, Bobby McClain then ran and jumped on Hahn before Hahn stabbed McClain. There is no evidence that the stabbing was accidental. The stabbing is therefore presumed to be an intentional act. A reasonable jury could find that this act was murder, because murder is the act of causing the death of another person while having the purpose of causing serious physical injury or death to that person. § 565.021. The question is whether a reasonable jury could also have found this to be voluntary manslaughter. Thus, we must consider whether it can be said as a matter of law that Hahn could have been under the influence of sudden passion arising from adequate cause within the meaning of § 565.023.

"Sudden passion" is defined as "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." § 565.002(7). Sudden passion is an unexpected force, motivated by another's provocation, that subdues the prior mental state momentarily in causing a responsive act. *Fears*, 803 S.W.2d at 609. The state points out that the only way to look at the evidence is that Hahn came up with the knife with an intention to injure McClain, and that he simply did what he intended. The only act on the part of McClain which could be considered provocation would be the act of jumping on Hahn (as described by Ricker). The defense implies that when Hahn entered the apartment with

the knife, perhaps he had not yet formed the intent to stab McClain. In view of their previous hostilities, the defense argues, McClain's actions could reasonably be regarded as inciting (or re-inciting) sudden passion in Hahn, and could also reasonably be regarded under *Fears* and *Redmond* as involving adequate provocation in that, if McClain ran and jumped on Hahn, a reasonable person could have believed his intention was to inflict serious injury on Hahn. The problem with this argument is that while Ricker's testimony does not conclusively show one way or another what Hahn intended when he refused to leave, entered the apartment, and wielded the knife, these actions are consistent with an intent to stab McClain, and there is other uncontradicted evidence suggesting that Hahn formed the intention to stab McClain before Hahn even arrived at the apartment. Hahn did not testify, so we have no statement by him denying specific intent in this regard.

The state argues that after the earlier altercation between the appellant and McClain had ceased, and Hahn had returned to his apartment, he learned that Bobby was still in the upstairs apartment. It was then, the state points out, that he armed himself with a butcher knife, announced that Bobby was "going to get it," opened the door to the apartment where Bobby was, refused a request to leave, and pulled the knife from his waistband.

The state contends that the actions of Hahn were not the result of the influence of sudden passion, because the law requires that the offense must have been committed in *sudden* passion, and not after there has been time for the passion to cool. *Redmond*, 937 S.W.2d at 208. The state contends that the undisputed evidence is that Hahn came looking for a fight, bearing the knife, and that even if the victim did run at and jump on him, that could not have been equated with sudden passion. The state says it could not be sudden passion because the only logical inference, if McClain jumped on Hahn, would have

been that he was acting in self-defense against the threat of Hahn's butcher knife. What is required is a sudden, unexpected encounter or provocation tending to excite passion beyond control. *Fears*, 803 S.W.2d at 609. This could not have been sudden or unexpected when Hahn went upstairs with the specific and stated intention to attack McClain, packing a butcher knife. The state notes that it is undisputed that McClain was unarmed, Hahn was armed, and Hahn had made the remark that McClain was "going to get it."

 There was abundant evidence that Hahn was holding forth the knife. Even Ricker said that Hahn came to the door and "he had the knife." There was testimony from J.R., however, that J.R. did not see a knife because Hahn was standing in the doorway with his hand down behind his back. What was implied by J.R.'s testimony, however, was that Hahn was holding the knife behind his back for purposes of surprise. What is also implied from J.R.'s testimony is that McClain would have seen that Hahn was holding something behind his back. The result, we conclude, is the same. All the evidence points to the fact that Hahn came to the apartment with the intention of stabbing McClain. Whatever actions McClain may have taken at that point, under the circumstances, do not constitute adequate cause. And a person wielding a knife with the intent of stabbing another is not entitled to claim "sudden passion" even if the intended victim takes aggressive action:

"The distinction between murder and voluntary manslaughter is found in the dividing line between malicious action on the one hand and action in the heat of passion on the other. Malice and heat of passion cannot coexist. The mere fact of passion on the part of the slayer will not reduce the crime from murder to voluntary manslaughter where he entertained a previous purpose to kill, unless it is made to appear

that such purpose was abandoned before the homicidal act was committed." 40 Am.Jur.2d Homicide § 48 (1999).

Because there was no testimony that Hahn had some intention in mind other than stabbing McClain when he went to the apartment, a reasonable jury could not conclude under the evidence that he had any other purpose in mind. Because a cooling off period had already transpired from any prior hostilities, and because those hostilities themselves could not amount to adequate cause, and because any action McClain took in jumping on Hahn could not be adequate cause in view of Hahn's intent to stab McClain, we hold that the trial court did not err in refusing an instruction in voluntary manslaughter.

### Bad Character Evidence

In his second point on appeal, Hahn argues that the trial court abused its discretion in rejecting his request for a mistrial when the prosecutor intentionally elicited from J.R. McClain the statement that he thought Hahn was carrying a knife because "I just knew how Paulie was." Hahn contends the state knew from J.R.'s prior deposition that he was likely to say this in response to the state's question about why J.R. believed Hahn had something in his hand. According to Hahn, the state intended that the statement come out purely as evidence that Hahn had the propensity to commit this crime, as evidence of Hahn's bad character, and in order to prejudice the defense's case. The trial court had earlier granted the defendant's motion *in limine* precluding the state from presenting such evidence. When the statement did come out, defense counsel objected and the court sustained and instructed the jury to disregard the statement, but the court refused to grant defendant's request for a mistrial.

Although the court instructed the jury to disregard J.R.'s allegedly prejudicial statement, Hahn contends that error in admitting incompetent evidence which is highly prejudicial is generally not cured by

an instruction withdrawing it from the jury's consideration. *State v. Benson*, 346 Mo. 497, 142 S.W.2d 52, 55 (1940). Hahn asserts, further, that when evidence of other crimes is erroneously admitted it is presumed to be prejudicial. *See State v. Brooks*, 675 S.W.2d 53, 59 (Mo.App.1984). The state must overcome the presumption of prejudice by proving beyond a reasonable doubt that the error was harmless. *State v. Miller*, 650 S.W.2d 619, 621 (Mo. banc 1983). To do so, the record must demonstrate that the defendant was not injured by the error by showing that the jury did disregard the statement or could not have been influenced by it. *State v. Chambers*, 898 S.W.2d 119, 123 (Mo.App. 1995). Hahn contends that the state has failed to do so and could not do so. He states: "Evidence that Paul was the type of person who concealed weapons was highly prejudicial to his defense, and it is impossible to show that the jury disregarded or could not have been influenced by J.R.'s statement." Hahn overlooks the fact that the presumption of prejudice is applicable when the prejudicial evidence is admitted. Here, it was not admitted. Rather, the objection was sustained and the jury was instructed to disregard the comment.

The state responds that this was not "clear evidence" of other crimes by the defendant, and that because the judge promptly sustained appellant's objection and instructed the jury to disregard the statement, any error was cured. Further, the state argues, since the jury heard testimony that Hahn had taunted the victim and had struck both Bobby and J.R. with a baseball bat just prior to the stabbing, this brief remark could not have been prejudicial even if the jury ignored the judge's admonition. The state argues that J.R.'s statement was "extremely vague and innocuous" because he was not asked if he thought Hahn had a weapon in his hand, merely if he thought he had something in his hand, and because he did not explain or

elaborate on what he meant by his statement that he "just knew how Paulie was."

■■■■■ The comment made by J.R. made no specific reference to any crimes committed by the defendant, but it tended to disparage Hahn's character and it was improper to elicit such a remark.[4] There is not a presumption of prejudice because the statement was not admitted in evidence. The objection was sustained and the jury was told to disregard it. Nevertheless, we will consider whether there was a prejudicial effect sufficient to require the declaration of a mistrial. The state points out that there was other properly admitted evidence of Hahn taunting Bobby and calling him names and striking both Bobby and J.R. with a baseball bat. Thus, his propensity for violence was already concretely in evidence elsewhere. Moreover, the evidence that he intended to stab McClain with the knife was overwhelming. A trial court's decision not to grant a mistrial is given "enormous discretion" on appeal. *State v. Wyman*, 945 S.W.2d 74, 77 (Mo.App.1997). It is normally presumed that the jury follows the instructions given it by the trial judge, *State v. Lyons*, 951 S.W.2d 584, 598 (Mo. banc 1997). We conclude that the court did not err in denying Hahn's request for a mistrial.

### Hearsay Testimony Impeaching a Witness

■■■ Hahn's third point on appeal asserts that the trial court erred in not allowing the defense to present the testimony of Officer David Lloyd concerning a telephone call he received from Roberta Osborn on the night of the stabbing in order to impeach the testimony of Roberta at trial. According to Officer Lloyd, he was working the booking desk at the police department. He answered the telephone and spoke to a woman who identified herself as Roberta Osborn. He testified, reading from his report, that she said she was at the Heartland East surgery waiting room and had been told by someone that the homicide "was done by a man named Bill Whitley . . . who lives in Oak Ridge." He testified that the woman said she wanted to speak to a detective about it rather than giving the information to him, but that he was unable to connect her with a detective. The trial court would not allow this testimony to be introduced at trial, ruling that there was insufficient foundation to establish that the call was actually made by Roberta Osborn and that, at any rate, the testimony of the officer regarding what someone told Ms. Osborn would be inadmissible hearsay. Hahn contends that this testimony is not hearsay in that it would not have been offered to prove the truth of the statement, rather he wished to introduce the officer's testimony in an effort to impeach Roberta's testimony that she was an eyewitness to the stabbing. Hahn also contends he laid a proper foundation for the impeachment.

In response to the court's point about lack of foundation, Hahn agrees that the general rule is that testimony about a telephone conversation is not admissible absent identification of the caller. *State v. Gragg*, 606 S.W.2d 252, 254 (Mo.App.1980). However, circumstantial evidence can be used to show the identity of the caller even though the recipient of the call cannot identify the voice. *Id.* Hahn contends, though, that is not necessary in this case, because Ms. Osborn testified that she placed a telephone call to the police station from the hospital the night of the murder. Ms. Osborn denied that she told any officer that Bill Whitley was responsible for

---

4. In the original copy of this opinion, issued December 19, 2000, we implied that the Buchanan County Prosecutor may have intentionally elicited the remark from the witness that he "just knew how Paulie was." Since issuing that opinion, it has come to our attention that our belief was incorrect because the Prosecutor, Mr. Scroggins, justifiedly asked the particular question, believing he would get a different answer, one given by the witness earlier in a deposition. Therefore, in this modified opinion, we wish to remove the suggestion of any intentional impropriety on the part of the prosecutor.

the stabbing. She testified that she believed she would have told the officer that someone told her that Hahn could be found at the residence of a man named Bill Whitley.

 Hahn also asserts that introducing Ms. Osborn's statement to the officer did not amount to hearsay. "A hearsay statement is any out-of-court statement that is used to prove the truth of the matter asserted." *State v. Sutherland,* 939 S.W.2d 373, 376 (Mo. banc 1997). Roberta's statement was not being offered to prove that McClain was stabbed by a man named Bill Whitley. It was being offered to show that if she was passing along information that Bill Whitley had killed McClain, that fact is inconsistent with her testimony that she witnessed Hahn stab McClain as she testified at trial. Anything that has the legitimate tendency to throw light on the "accuracy, truthfulness, and sincerity of a witness is proper for determining the credibility of the witness." *State v. Strughold,* 973 S.W.2d 876, 891 (Mo.App. 1998).

We tend to agree with the defense that the objections as to hearsay and lack of foundation were not well taken. In any event, we conclude that there was no harm in excluding this testimony because, once the entire set of facts were set forth, the jury would have realized that either the officer misunderstood what Ms. Osborn told him that night or that he misinterpreted his notes later, because what Ms. Osborn actually told the officer is that someone told her that the stabber could possibly be located at the residence of a man named Bill Whitley in the Oak Ridge Apartments. Ms. Osborn had already made a statement to police about what she saw prior to ever going to the hospital. The police at that time asked her to let them know if she learned anything about Hahn's whereabouts. It is not reasonable to believe that the purpose of her call was to change her prior statement about who did the stabbing. Rather, it is only rea-

sonable to believe that the purpose was to try to inform police of what she had heard about the location of Paul Hahn. The officer may have understood her to say a man named Bill Whitley was responsible for the stabbing, but it is extremely unlikely that any juror would believe that is what she said, or what she intended to say. Accordingly, we find the denial of admission of this evidence to be harmless error.

### Prejudicial and Inflammatory Statements

 In his fourth and final point on appeal, Hahn argues that the trial court plainly erred in failing to *sua sponte* declare a mistrial when the prosecutor presented prejudicial and inflammatory statements before the jury. Hahn contends the prosecutor improperly questioned the defendant's expert witness on cross-examination about a toxicology report that was not in evidence, implying through the question and answers that it showed that McClain had no drugs or alcohol in his system at the time of his death. Secondly, Hahn complains that the prosecutor improperly injected into his closing argument the suggestion that it is a military practice when stabbing someone to thrust the knife in sideways so it would go under the ribs in order to damage the internal organs.

Hahn acknowledges that his defense counsel's failure to raise the issue of the toxicology report in his motion for new trial, and his failure to object to the argument about military technique in the second instance, leaves these contentions unpreserved.

The toxicology report was not presented nor admitted into evidence by the state during its case-in-chief, but, according to Hahn, the prosecutor essentially told the jury what the results of the toxicology report were by his questioning of the defendant's expert witness during cross-examination. The information that the toxicology report showed McClain free of drugs and alcohol was prejudicial to the defense, according to the defense, because

the crux of the defense theory was that McClain was a hot-headed, angry young man who liked to drink and then pick fights with other people and that that night, he was drunk and picked a fight with Paul Hahn. The defense does not maintain that the statements about the toxicology were in fact inaccurate, or that the prosecution was in bad faith.

 According to Hahn, the prosecutor prejudiced Hahn's defense again when he argued that the reason Hahn stabbed McClain while holding the knife horizontally was that this was a military move. There was no evidence that Hahn had been in the military or knew anything about military-style weapons handling, or even that this is a military practice at all. Hahn contends that the statement was injected simply to inflame the passions of the jury. Hahn contends that the court should have declared a mistrial on either of these two errors. Trial courts have wide discretion in controlling closing arguments, but they abuse that discretion when they allow plainly unwarranted and injurious arguments. *State v. Thomas,* 780 S.W.2d 128, 135 (Mo.App.1989).

The state responds to this final point by stating that the trial court did not commit "plain error" in not declaring a mistrial when the prosecutor asked the defendant's expert witness if he had "reviewed a toxicology report showing Bobby McClain negative for alcohol or drugs" or when the prosecutor stated in closing argument that the victim had been stabbed "military-style." In the first instance, the court sustained the defense's objection and instructed the jury to disregard the question. A jury is presumed to follow the court's instructions. *Lyons,* 951 S.W.2d at 598. In the second instance, there was evidence that the appellant stabbed the victim with the knife blade pointed sideways and that he then "twisted" the knife, causing damage to the victims internal organs. Defendant fails to show that his non-preserved contentions indicate on their face, in the light of the overall facts of the

case, that a manifest injustice or miscarriage of justice resulted from the failure of the trial court to intervene *sua sponte* and take additional corrective action. *See State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). Accordingly, we deny plain error review. *See State v. Parker,* 856 S.W.2d 331, 333 (Mo. banc 1993).

### Conclusion

For the foregoing reasons, the judgment is affirmed.

HOLLIGER and BRECKENRIDGE, JJ., concur.