STATE of Missouri, Respondent,

v.

Jamie AVERY, Appellant.

No. SC 85300.

Supreme Court of Missouri,
En Banc.

Nov. 25, 2003.

Craig A. Johnston, Office of the Public Defender, Columbia, for appellee.

Jeremiah W. (Jay) Nixon, Atty. Gen., Nicole E. Gorovsky, Asst. Atty. Gen., Jefferson City, for respondent.

LAURA DENVIR STITH, Judge.

Defendant Jamie Avery was convicted of second-degree murder and armed criminal action under section 565.021 and section 571.015.[1] The judge sentenced her to two consecutive terms of thirty years imprisonment. On appeal, Ms. Avery claims that the trial court erred in refusing to instruct the jury on self-defense, defense of premises, and voluntary manslaughter. This Court agrees. Although Ms. Avery testified at trial that the shooting was an accident, the State introduced evidence of prior statements by her to the police and to her boyfriend that supported submission of the theories that the shooting was intentional but done in self-defense or defense of premises or that it arose out of sudden passion based on adequate cause. Accordingly, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

## I. FACTUAL BACKGROUND

In October 2000, Ms. Avery began an intimate relationship with and moved into the house of John Hamilton. That same month Ms. Avery had a sexual encounter with Bruce Paris, the deceased. Thereafter she and Mr. Paris began making plans to go to Chicago together. Before these plans came to fruition, however, Mr. Paris called off the trip because he had rekindled his relationship with an ex-girlfriend. Upon hearing this news, Ms. Avery became upset and made some verbal threats against Mr. Paris. Mr. Paris went with his ex-girlfriend to North Carolina and then moved alone to Chicago later that month, returning to Missouri not quite two months later, on December 4, 2000.

About two weeks before Mr. Paris' return to Missouri he made numerous harassing telephone calls to Ms. Avery and Mr. Hamilton at their home. During the last telephone call, Ms. Avery warned him she would call the police if he did not stop calling. Nonetheless, on December 6, 2000, just two days after his return to Missouri, Mr. Paris told a mutual friend, Regina Buckner, that he wanted to see Ms. Avery.

That afternoon, Ms. Buckner found Ms. Avery drinking at a local tavern and told her that Mr. Paris wished to see her again. Ms. Avery initially replied that she had no intention of seeing Mr. Paris again. She apparently later changed her mind, however, for that evening she and Ms. Buckner drove to a local store to meet Mr. Paris. Ms. Avery later testified that the three drove around town drinking alcohol, while Ms. Buckner and Mr. Paris also smoked marijuana. During this drive, Ms. Avery said, Mr. Paris grabbed her breast and covered her mouth with his hand, causing

---

1. All statutory references are to RSMo 2000 unless otherwise indicated.

her to bite him because she could not breathe. After this incident, the three eventually went to Ms. Avery's home.

Mr. Paris remained alone at Ms. Avery's home while Ms. Avery returned Ms. Buckner to the latter's car. Ms. Avery then returned home. After being dropped off at her car, Ms. Buckner went to her friend Becky Gibbs' house and told her that Mr. Paris was at Ms. Avery's home. Ms. Gibbs was a friend of Ms. Avery's boyfriend, John Hamilton, who was in California on business. She called Mr. Hamilton and told him that Mr. Paris was in his home. Mr. Hamilton immediately called Ms. Avery and confronted her with this information. Ms. Avery assured him that she only wanted to tell Mr. Paris to leave them alone.

At trial, Ms. Avery testified that, after Mr. Hamilton's telephone call, she repeatedly asked Mr. Paris to leave, but he refused to do so. When she attempted to open the door, he placed his foot in front of it. Ms. Avery became scared and retrieved Mr. Hamilton's revolver from her bedroom. Although she did not directly point the revolver at Mr. Paris, she displayed the weapon and ordered him to leave. After seeing the revolver, Mr. Paris left on foot.

Twenty minutes after Mr. Paris' departure, Ms. Avery decided to walk her dog. She took the revolver with her because she had once been gang-raped and was afraid of the dark. While walking the dog, Ms. Avery heard noises and saw a figure approaching her. It was just after 9 p.m. Scared, Ms. Avery ran inside her home, but accidentally left the door open. Unsure who was coming, she pointed the revolver at the door. Mr. Paris entered the doorway. Ms. Avery testified that, upon seeing the revolver pointed at him, he became angry and said to her, "Put the f---ing gun down or else I'll beat your f---ing a--." She testified that Mr. Paris then quickly began to approach her and attempted to grab the revolver. Ms. Avery stepped back.

At this point, although Ms. Avery consistently admitted to shooting Mr. Paris, her explanation of how that shooting occurred varied. At trial, she testified that the gun went off accidentally as she and Mr. Paris struggled for it and she did not intend to shoot him. She admitted, however, that immediately after the shooting, she had locked herself in her bedroom and, upon calling the Hickory County sheriff's department, had stated that she had "shot an intruder."

After calling the police, Ms. Avery called Mr. Hamilton to tell him what happened. He described her as "extremely upset" and "pretty hysterical" until the police arrived. He also noted that she was screaming. During this conversation, Ms. Avery told him that she "was scared" and that Mr. Paris "was going to hurt me." She also told Mr. Hamilton that Mr. Paris "came at me and I shot him."

The police arrived at about 9:15 p.m. and found Mr. Paris dead on the floor. Ms. Avery told both Deputy Barry Walker and Sheriff Ray Tipton that she had shot an intruder. Deputy Walker noted that Ms. Avery was extremely upset and that she was visibly shaking. Police noticed Mr. Paris' pants were unzipped and found a picture of Ms. Avery with a note on it from her in his pocket. Upon being confronted with the picture, Ms. Avery admitted that she had given Mr. Paris the picture earlier that evening. Mr. Paris had seen the picture sitting on her coffee table and asked to keep it. Ms. Avery said that he could keep it if he promised to leave her alone. An autopsy revealed alcohol in Mr. Paris' stomach and one of Ms. Avery's hairs, with the root still attached, clutched in his hand.

Later that evening, after receiving *Miranda* warnings, Ms. Avery gave a five-page written statement to Sheriff Tipton. In that statement, she described the shooting incident in some detail, but did not mention Mr. Paris' refusal to leave her home twenty minutes before the shooting occurred. The next day, December 7, 2000, she gave another statement to George Knowles, an investigator with the Missouri State Highway Patrol, in which she did mention that she had to display the revolver to Mr. Paris to get him to leave some twenty minutes before the shooting.

The jury was instructed on first-degree murder, second-degree murder, involuntary manslaughter, and armed criminal action. Ms. Avery also argued that the evidence supported instructions on self-defense, defense of premises, and voluntary manslaughter and requested that these instructions be given. The trial court refused the self-defense and defense of premises instructions because Ms. Avery testified that the shooting was accidental. The court also refused the voluntary manslaughter instruction, believing that no evidence was produced on the element of heat of passion.

The jury found Ms. Avery guilty of second-degree murder and armed criminal action. Ms. Avery appeals, asserting error in failing to submit self-defense, defense of premises, and voluntary manslaughter.[2] Following opinion by the Missouri Court of Appeals, Southern District, this Court granted transfer. *Mo. Const. art. V, sec. 10.*

## II. STANDARD OF REVIEW

■ Defendant claims that the trial court erred in refusing to submit instructions on self-defense, defense of premises, and voluntary manslaughter. In determining whether a refusal to submit an instruction was error, "the evidence is viewed in the light most favorable to the defendant." *State v. Westfall,* 75 S.W.3d 278, 280 (Mo. banc 2002). "If the evidence tends to establish the defendant's theory, or supports differing conclusions, the defendant is entitled to an instruction on it." *Id. See also State v. Taylor,* 944 S.W.2d 925, 936 (Mo. banc 1997).

## III. SELF–DEFENSE INSTRUCTION

Although Ms. Avery testified at trial that the shooting was an accident, she claims that the State introduced several of her prior statements into evidence showing that the shooting was done intentionally in self-defense during the struggle over the revolver, thus requiring a self-defense instruction.

■ A self-defense instruction must be submitted "when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony." *Westfall,* 75 S.W.3d at 281. *See also State v. Weems,* 840 S.W.2d 222, 226 (Mo. banc 1992). Failure to submit a self-defense instruction when required by the evidence constitutes reversible error. *Westfall,* 75 S.W.3d at 280; *Weems,* 840 S.W.2d at 226. "Substantial evidence" is evidence putting a matter in issue. *Weems,* 840 S.W.2d at 226. Where, as here, the defender killed the victim, evidence of four elements is required to make a submissible claim of self-defense: (1) absence of aggression or provocation on the defender's part; (2) real or apparent

---

2. Ms. Avery also contends that the trial court abused its discretion in declining to remove one juror and in forcing her to present her videotaped statement at the same time as the jury received a transcript of it, so that the jurors read the transcript rather than looking at the videotape. Because neither of these alleged errors is likely to recur on retrial, it is unnecessary to reach these issues.

necessity for the defender to kill to save herself from an immediate danger of serious bodily injury or death; (3) reasonable cause for the defender's belief in such necessity; and (4) an attempt by the defender to do all within her power consistent with her personal safety to avoid the danger and the need to take a life. *Id.*

■ As a general rule a defendant is not entitled to an instruction on self-defense if defendant claims accident. This is because self-defense constitutes an intentional but justified killing, whereas accident connotes an unintentional killing. Self-defense and accident are therefore inconsistent. So, if a defendant takes the position at trial that a killing was accidental, as did Ms. Avery here, the defendant normally may not also submit self-defense. *State v. Randolph,* 496 S.W.2d 257, 262 (Mo. banc 1973).[3]

■ But, as the State acknowledges, self-defense is submissible, even where defendant testifies that the killing was an accident, if the inconsistent evidence of self-defense is offered by the State or by defendant through the testimony of a third party.[4]

Here, the State admits it offered the evidence of prior inconsistent statements by defendant that supported self-defense. Nonetheless, the State asserts, even though it was the State that introduced this evidence, the evidence should be treated as if it were simply contradictory, self-serving evidence offered by the defendant, since it consisted of defendant's own prior statements. In support, the State cites *State v. Randolph,* 496 S.W.2d 257 (Mo. banc 1973); *State v. Peal,* 463 S.W.2d 840, 842 (Mo.1971); *State v. Wright,* 352 Mo. 66, 175 S.W.2d 866, 871 (1943); and *State*

*v. East,* 976 S.W.2d 507, 509 (Mo.App. W.D.1998).

None of these cases support the State's argument. In *East* and *Peal,* the inconsistent evidence that defendant alleged supported submission of self-defense came solely from the defendant's own trial testimony. That is, defendant offered inconsistent testimony at trial, some supporting self-defense and the rest supporting accident. Neither the State nor any third-party witness introduced the defendant's statements nor presented any other conflicting evidence. These cases are not on point.

*Randolph* and *Wright* are directly on point, but they specifically reject the State's position. In *Wright,* defendant testified at trial that he was not the one who attacked the victim. He nonetheless sought to submit self-defense based on his prior inconsistent statements to police that he acted in self-defense. The State, as here, cited cases holding that a defendant cannot introduce prior, self-serving statements to support submission of alternative, inconsistent theories.

But, *Wright* noted, it was *the State,* not defendant, that had introduced the prior inconsistent statements by defendant that supported self-defense. *Wright* then cited *State v. Creighton,* 330 Mo. 1176, 52 S.W.2d 556, 562 (1932), for the proposition that a prior inconsistent extra-judicial statement of the defendant can support submission of self-defense where that evidence was introduced by the State. *Wright* reaffirmed *Creighton,* stating:

The well-settled rule is that ... if the State has introduced the whole admission or statement, the defendant would

---

3. *Accord, State v. Peal,* 463 S.W.2d 840, 842 (Mo.1971).

4. *See, e.g., State v. Eldridge,* 554 S.W.2d 422, 425 (Mo.App.1977); *Randolph,* 496 S.W.2d at 262; *Peal,* 463 S.W.2d at 842; *State v. Baker,* 277 S.W.2d 627, 629–30 (Mo.1955).

be entitled to rely on the parts thereof favorable to him. *He* is not the one who introduced it. He is merely saying, in effect, that if the State desires to present his statement to the jury they must consider the part in his favor, though inconsistent with his own testimony. *Wright,* 175 S.W.2d at 872. This Court therefore concluded, "We can see nothing wrong in that contention.... Surely, on the State's own showing he was entitled to have those parts of the statement considered by the jury, which disclosed in what circumstances he did the cutting." *Id.*

Similarly, in *Randolph,* the State introduced evidence that, when first arrested, defendant had told a story to the police that included the claim that the victim was killed by accident in the course of a struggle and that the defendant thought he was acting in self-defense in the struggle. The State then argued that the trial court did not err in refusing to submit self-defense or accident because the only evidence to support these statements were the self-serving statements of defendant in his statement to the police. *Randolph* rejected this argument, stating:

> The difficulty with this position is that defendant offered no evidence, and the State adduced the evidence of defendant's confession which contained, in addition to admissions of guilt, the elements of both self-defense and excusable homicide by accidental shooting. Where the evidence on such inconsistent defenses is "offered by the State [as in Randolph's case] or proved by third party witnesses for the defendant," instruc-

tion on the inconsistent defenses is justified.

496 S.W.2d at 262.[5]

Here, as in *Randolph, Wright,* and *Creighton,* it was *the State* that introduced Ms. Avery's prior inconsistent confessions to the police and to Ms. Avery's boyfriend, Mr. Hamilton. Therefore, as in those cases, if the evidence introduced by the State was sufficient to insert the issue of self-defense into the case, then defendant was entitled to an instruction on that defense, even if that evidence consisted of defendant's own prior inconsistent statements.

The State suggests that Ms. Avery's prior statements were insufficient to inject the issue of self-defense into the case. This contention is incorrect and is at least partially inconsistent with the position taken by the State at trial. In fact, once the State successfully opposed submission of a self-defense instruction, the prosecutor then argued to the judge that there was enough evidence of self-defense that the State should be permitted to refer to it in closing argument to support the State's claim that Ms. Avery intentionally shot the victim, stating:

> Prosecutor: "... there has been some evidence that she shot him because he came at her and she was afraid. And although the Court has properly decided not to instruct on self defense in this case, still the jury could be—I think it's appropriate to mention defending herself when giving closing argument."

---

5. *See also Westfall,* 75 S.W.3d at 280–81 (citing *Wright* for the proposition that "an instruction on self-defense must be given when substantial evidence is adduced to support it, even when that evidence is inconsistent with the defendant's testimony"); *Eldridge,* 554 S.W.2d at 425 ("[I]f a defendant by his own testimony provides the basis for an accident instruction it must be given though he is entitled to an instruction on self-defense by reason of evidence offered by the State. We see no reason why an accused should be denied the benefit of both defenses when the evidence supporting each is supplied by the State").

Court: "There was also comments in evidence, statements by the defendant in reference to that as well as the parties I believe brought up the issue in their opening statements."

Indeed the State's opening statement did bring up the issue of Ms. Avery's prior inconsistent claims of self-defense when the prosecutor said:

Sheriff Ray Tipton is going to testify that he took the defendant from the scene to the sheriff's department and had her fill out a written statement. *And then the defendant began to indicate that she did not at first know who it was she shot but that later she shot someone in self-defense.*

. . .

. . . And then later the evidence will be that she talked to the sheriff and the sheriff indicated that, yeah, *she said she shot an intruder and said she'd shot someone in self-defense.*

(emphasis added).

In accordance with the position he took in opening statement, the prosecutor offered several witnesses whose testimony supported self-defense. Sheriff Tipton testified for the State, in part, to introduce Ms. Avery's five-page written confession into evidence. He testified that Ms. Avery stated that Mr. Paris threatened to "beat [her] a--" if she did not drop the revolver and that she said that Mr. Paris then "grabbed the gun and I pulled away and I pulled the trigger."

Mr. Knowles of the highway patrol also testified that Ms. Avery told him in her second statement that when Mr. Paris returned to her home on the evening of the shooting, she pointed the revolver at him and told him to leave, that Mr. Paris said to Ms. Avery that she should drop the revolver or he would "kick her a--," and that when Ms. Avery refused, Mr. Paris "made a movement towards her. She backed away, and fired one shot."

Jamie Seitz, who was a prisoner with Ms. Avery, also testified for the State that Ms. Avery told her while in jail that Mr. Paris had "started coming after the gun and they started wrestling."

Finally, the State offered the testimony of defendant's boyfriend, John Hamilton. Mr. Hamilton testified that when Ms. Avery called him she was "basically screaming," and was "extremely upset." She told Mr. Hamilton, "Oh, my God, I shot him," and "I was scared. There was a struggle . . . He came at me and I shot him." She also told Mr. Hamilton that she thought the deceased "was going to hurt me," that he had threatened to hurt her, and that there had been a confrontation.

■ In closing argument, the State used this evidence of Ms. Avery's prior statements and claims of self-defense to show premeditation in support of its first-degree murder charge. But, as *Wright* and *Creighton* note, defendant was entitled to use that same evidence to support her alternative argument of self-defense. The jury could have believed from this evidence that Ms. Avery shot the revolver intentionally, but did not premeditate and did so only in self-defense once Mr. Paris began to come at her and tried to grab the gun. It was up to the jury to decide the credibility of the testimony presented.[6] For this reason, the trial court erred in refusing to instruct the jury on self-defense. *Westfall,* 75 S.W.3d at 281; *Weems,* 840 S.W.2d at 226; *Wright,* 175

---

6. *See also State v. Redmond,* 937 S.W.2d 205, 209 (Mo. banc 1996); *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989) (jurors are free to accept part of the witness' testimony while rejecting other aspects of it).

S.W.2d at 870–71; *State v. Bidstrup,* 237 Mo. 273, 140 S.W. 904, 907 (1911).

## IV. DEFENSE OF PREMISES

The trial court similarly refused to submit an instruction on defense of premises because Ms. Avery testified that the shooting was an accident and there was insufficient evidence that deadly force was needed. Ms. Avery claims there was evidence supporting defense of premises and the refusal to submit defense of premises was reversible error.

■ "In Missouri, defense of premises is essentially accelerated self-defense because it authorizes 'protective acts to be taken earlier than they otherwise would be authorized, that is, at the time when and place where the intruder is seeking to cross the protective barrier of the house.' " *Perkins v. State,* 77 S.W.3d 21, 24 (Mo. App. E.D.2002). Once the person enters the premises without resistance, "the principles of self-defense apply." *State v. Lumpkin,* 850 S.W.2d 388, 392 (Mo.App. W.D.1993). Section 563.036.2 provides that deadly force may be used in defense of premises when a person "reasonably believes it necessary to prevent what [s]he reasonably believes to be an attempt by the trespasser to commit arson or burglary upon h[er] dwelling." Sec. 563.036.2(2).

Ms. Avery had the burden of injecting the issue of defense of premises into the case. Sec. 563.036.3. The State claims she did not do so, because the evidence at most proves a trespass. Ms. Avery claims that, to the contrary, the evidence supported the occurrence of a burglary because Mr. Paris was attempting to enter her house against her will for the purpose of assaulting her.

Burglary in the first degree occurs when a person "knowingly enters unlawfully or knowingly remains unlawfully in a building or inhabitable structure for the purpose of committing a crime therein" and "there is present in the structure another person who is not a participant in the crime." Sec. 569.160.1(3). An assault in the third-degree occurs if "the person knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative." Sec. 565.070.1(5).

■ Thus, Ms. Avery was entitled to submission of defense of premises if there was evidence from which the jury could find that Mr. Paris was attempting to enter the premises unlawfully against resistance by her for the purpose of knowingly causing offensive physical contact with her. Although in the usual case the facts would not be likely to support submission of both this defense and regular self-defense, on the unusual facts of this case there was evidence supporting both submissions.

Ms. Avery testified that she told Mr. Paris to leave the premises and had to force him out by displaying a revolver. He returned, trespassed, came to her open door, saw her resist his entry by pointing a revolver at him, and moved toward her, threatening to "beat [her] f---ing a--" if she did not drop the gun. He then walked purposefully toward her and struggled with her for the gun. Ms. Avery shot him. He was found dead in the doorway. A hair with the root attached was found in his hand, supporting an inference that he had grabbed her hair during the struggle, and his pants were found unzipped.

■ From this evidence, the jury could have found that Mr. Paris was attempting to enter the premises against resistance for the purpose of beating her and that he grabbed her hair in doing so and struggled with her for the gun. The credibility of this testimony was for the jury. The evidence supported a defense of premises

instruction and failure to give it constituted reversible error.

## V. VOLUNTARY MANSLAUGHTER

Ms. Avery alleges that the trial court erred in refusing to submit an instruction on voluntary manslaughter because the evidence produced at trial was sufficient to prove sudden passion arising from adequate cause.

■ Voluntary manslaughter is a lesser-included offense of second-degree murder. Sec. 565.025.2(2)(a). Instruction on a lesser-included offense is required if the evidence produced at trial, by fact or inference, provides a basis both for the acquittal of the greater offense and the conviction of the lesser offense. Sec. 556.046.2.[7] When in doubt, courts should instruct on the lesser-included offense, leaving it for the jury to decide of which offense, if any, the defendant is guilty.[8]

A person commits voluntary manslaughter if she "causes the death of another person under circumstances that would constitute murder in the second degree ... except that [s]he caused the death *under the influence of sudden passion arising from adequate cause.*" Sec. 565.023.1(1) (emphasis added). Ms. Avery had the burden of injecting this issue through evidence showing sudden passion and adequate cause for it. Secs. 565.023.2; 556.051. Upon such a showing, she was entitled to an instruction on voluntary manslaughter. *Redmond,* 937 S.W.2d at 208.

■ The State says that the events Ms. Avery points to cannot meet this standard, for they all occurred some time be-fore the actual shooting, giving Ms. Avery time to cool down. And, as the State notes, "sudden passion" is "passion directly caused by and arising out of provocation by the victim or another acting with the victim which passion arises at the time of the offense and is not solely the result of former provocation." Sec. 565.002(7). This may include terror, "but it must be so extreme that for the moment, the action is being directed by passion, not reason." *State v. Fears,* 803 S.W.2d 605, 609 (Mo. banc 1991). This means that sudden passion is not established if there was ample time for that passion to cool. *Redmond,* 937 S.W.2d at 208; *Fears,* 803 S.W.2d at 609.

Moreover, the State argues, even if this evidence caused Ms. Avery to experience sudden passion, she cannot prove adequate cause for such passion under the law because Mr. Paris only uttered a few profane words, and words alone are insufficient to show adequate cause. *Redmond,* 937 S.W.2d at 208; *Fears,* 803 S.W.2d at 609. "Adequate cause" is "cause that would reasonably produce a degree of passion in a person of ordinary temperament sufficient to substantially impair an ordinary person's capacity for self-control." Sec. 565.002(1).

■ The State is correct that much of Ms. Avery's factual support comes from events occurring well before the shooting. But, while the statute and relevant cases are clear that prior provocation can never be the sole cause of sudden passion, they do not state that such evidence is irrelevant. Such evidence may be relevant to show why, when combined with other evi-

---

7. *See State v. Derenzy,* 89 S.W.3d 472, 474 (Mo. banc 2002); *State v. Beeler,* 12 S.W.3d 294, 299 (Mo. banc 2000); *State v. Fowler,* 938 S.W.2d 894, 898 (Mo. banc 1997); *Redmond,* 937 S.W.2d at 208.

8. *Derenzy,* 89 S.W.3d at 474–75; *Beeler,* 12 S.W.3d at 300; *State v. Hibler,* 5 S.W.3d 147, 148 (Mo. banc 1999); *State v. Santillan,* 948 S.W.2d 574, 577 (Mo. banc 1997).

dence of events occurring immediately before the incident, the precipitating incident was adequate to show sudden passion. *See, e.g., State v. Battle,* 32 S.W.3d 193, 197 (Mo.App. E.D.2000); *State v. Richards,* 795 S.W.2d 428, 435 (Mo.App. E.D.1990). Similarly, while words alone are insufficient to show adequate provocation, *Redmond,* 937 S.W.2d at 208; *Fears,* 803 S.W.2d at 609, little more is required—a mere tweaking of the nose has been found sufficient. *Fears,* 803 S.W.2d at 609.

■ Applying these principles here, while evidence of Ms. Avery's past relationship with Mr. Paris and his past conduct toward her is not sufficient in itself to support a claim of sudden passion or adequate cause, it is relevant to show why she feared Mr. Paris and why his conduct immediately before the event caused her such terror. Ms. Avery produced evidence that Mr. Paris made harassing telephone calls to her and her boyfriend in the weeks before the shooting. The evening of the shooting, he grabbed her breast without permission and covered her mouth with his hand in a way that caused her difficulty breathing. She had to bite him to get him to let go. When, earlier in the evening, she told him to leave, he refused to do so until she retrieved her revolver. Then, when walking her dog, she heard a sound but could see no one. She became particularly frightened because it was dark out and she had once been gang-raped in the dark. She ran back inside, pulled out the gun, and pointed it at the door. She knew Mr. Paris had been drinking and smoking marijuana.

When Mr. Paris appeared in the doorway, she said, "he looked mad" and threatened to beat her if she did not drop the revolver. She claimed that when he said this, and then walked quickly toward her and tried to grab the gun, she was "scared to death" and shot him. Immediately afterward, she ran to her bedroom and locked the door because she feared that Mr. Paris would retrieve the revolver and come after her. While in the bedroom, Ms. Avery called Mr. Hamilton. He testified that when Ms. Avery called him, she was "pretty hysterical." She told Mr. Hamilton that she was "scared" and that Mr. Paris was going to hurt her. Finally, one of Ms. Avery's hairs, with the root attached, was found in Mr. Paris' hand.

■ This evidence was minimally sufficient to inject the issue of sudden passion based on adequate cause. Because Ms. Avery satisfied her statutory burden of injecting the voluntary manslaughter issue through this evidence, she was entitled to a jury instruction on voluntary manslaughter. *Redmond,* 937 S.W.2d at 208. While the State introduced contrary evidence, the jury as fact finder was entitled to consider all of the evidence and make its own credibility determination. The trial court's refusal to instruct the jury on voluntary manslaughter was reversible error.

## VI. CONCLUSION

■ Because the evidence warranted instructions on self-defense, defense of premises, and voluntary manslaughter, the trial court's denial of Ms. Avery's request for these instructions was erroneous. Ms. Avery's conviction of second-degree murder is, therefore, reversed. Because armed criminal action requires the commission of an underlying felony,[9] Ms. Avery's conviction for that offense is also reversed. The case is remanded for a new trial.

All concur.

---

**9.** Sec. 571.015.1; *Redmond,* 937 S.W.2d at 210; *Weems,* 840 S.W.2d at 228.