**STATE of Missouri, Respondent,**

v.

**Christopher D. COEN, Appellant.**

No. WD 72963.

Missouri Court of Appeals, Western District.

April 24, 2012.

Ellen H. Flottman, District Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Jennifer A. Wideman, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division II: VICTOR C. HOWARD, Presiding Judge, and MARK D. PFEIFFER and KAREN KING MITCHELL, Judges.

MARK D. PFEIFFER, Judge.

Christopher Coen ("Coen") appeals the judgment of his convictions following a jury trial before the Circuit Court of Cass County, Missouri ("trial court"), of robbery in the first degree, § 569.020,[1] and armed criminal action, § 571.015. The trial court sentenced him to consecutive terms of ten years' imprisonment for first-degree robbery and three years' imprisonment for armed criminal action. In his sole point on appeal, Coen asserts that he was deprived of his due process right to present a defense, and that his convictions should be reversed and he should be granted a new trial, because he argues the trial court erred in refusing his proffered jury instruction on duress. We affirm.

### Facts and Procedural History[2]

On June 26, 2009, at about 6:00 p.m., Cynthia Creek ("Creek") and her family were driving down a row in a strip mall parking lot in Harrisonville, Missouri, when she passed a car whose two occupants were "down in the seat" and wearing red bandanas over their faces. Creek parked and saw the car with the two men park at the curb in front of the door to a

---

1. All statutory references are to the Revised Statutes of Missouri 2000, the statutes in effect at the time the offenses were committed on June 26, 2009. *State v. Nash*, 339 S.W.3d 500, 508 (Mo. banc 2011).

2. In determining whether the trial court's refusal to submit a jury instruction was error, " 'the evidence is viewed in the light most favorable to the defendant.' " *State v. Avery*, 120 S.W.3d 196, 200 (Mo. banc 2003) (quoting *State v. Westfall*, 75 S.W.3d 278, 280 (Mo. banc 2002)).

commercial retail store called "The Shoe Department." Both men exited the car at the same time and went into The Shoe Department. Creek saw that the two men were wearing oversized white shirts, khaki shorts that went down below their knees, and bandanas. She thought the passenger was holding something. Creek called the police to report a robbery in progress.

Robin Lee ("Lee") was shopping in The Shoe Department between 5:00 and 6:00 p.m. on June 26. She was standing at the check-out counter in the front of the store to pay for her item when she heard someone yell from the front door: "Get down on the effing floor; I'm effing serious." When she did not promptly obey, one of the men pumped a baseball bat toward her face and repeated, "Get down. I said get down on the effing floor; I'm effing serious." She noticed that the other man had a crowbar-type tool in his hand. Lee lay face-down on the floor next to the counter.

Rachel Ephland ("Ephland"), the assistant store manager, was ringing up Lee at the cash register when she heard the yelling. After Ephland lay on the floor, someone jumped over her and starting pulling at the cash register, creating a loud commotion. She glanced up and saw that the man was wearing a red bandana covering his face, dark sunglasses, a white long-sleeved button-up dress shirt, and denim shorts or pants. When the men headed toward the front door, Ephland stood up and went to the door. She saw both men were dressed alike; one man was carrying the cash register, and the other man was carrying a bat. She got the first three digits of the license plate of the car the men entered.

About two minutes after Creek saw the men enter The Shoe Department, she saw them coming out with "something that looked like a computer type black big box."

The driver got in the car while the passenger tried to shove the object through the window. After struggling unsuccessfully, the passenger opened the trunk and threw the object in. The passenger then got in the car, and the car sped off. As they left, Creek was able to write down the license plate number.

At 6:30 p.m. on June 26, Harrisonville police department detective Stan Belk was called to assist in the investigation of the robbery. When he was processing the scene inside the store, he heard a transmission that the sheriff's department was in pursuit of a vehicle that matched the description of the suspects' vehicle. During the pursuit, the deputy sheriffs saw items being thrown out of the vehicle. They recovered three red bandanas and an aluminum baseball bat. The vehicle was eventually detained and a suspect, identified as Dustin Miller ("Miller"), was arrested and transported to the sheriff's department. Miller had $280 in cash in his pockets. The police obtained a search warrant and conducted a search of Miller's car. Among the items found was a cash register, which was heavily damaged and appeared to have been pried open.

A confidential informant met with Detective Belk and identified Coen as the second suspect in the robbery. The informant stated that she could get Coen to turn himself in. Detective Belk met Coen at the sheriff's department on July 8. On July 9, Detective Belk advised Coen of his *Miranda* rights [3] and conducted an interview. Coen told Detective Belk that he had known Miller for some time and that Miller had talked to him several times about committing the robbery. Coen said that he told Miller that he was not really interested; but he also told Miller that he was having severe financial problems and had to pay a fine due to an arrest for

---

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.    1602, 16 L.Ed.2d 694 (1966).

possession of marijuana. Coen told Detective Belk that he and Miller met on June 24, and Coen agreed to commit the robbery with Miller.

Coen explained to Detective Belk that a friend dropped him off in Harrisonville, where Coen called Miller, and Miller arrived to pick him up. The two drove to the strip mall where The Shoe Department was located. Miller gave Coen a white long-sleeved shirt and a red bandana to wear and a crowbar to carry. Miller was wearing a white shirt, red bandana, and a black baseball cap and carried an aluminum baseball bat. Miller went inside the store first, and Coen followed. Miller started shouting and telling people to get on the floor. Coen jumped over the counter and grabbed the cash register; then he and Miller ran out of the store. Coen threw the cash register in the back of Miller's car, and they left. When they stopped, Miller pried open the cash register, and they evenly split $700. Miller dropped Coen off at a friend's house. With the money, Coen paid his fine for the marijuana charge, gave his father money for rent, and paid a debt owed to a friend.

Detective Belk also obtained a written statement from Coen, in which Coen stated that Miller "picked me up and forced me to help him. I really still didn't want to but it was like he was threatening me."

Joshua Sidwell ("Sidwell") testified for the defense that he knew both Miller and Coen. He stated that Miller bullied Coen and would daily punch Coen in the arm or push him around or run up and kick him in the leg or the gut. However, Sidwell acknowledged that he and Miller and Coen all "hung out" together regularly and that Miller never threatened Coen with a weapon, beat Coen up, or directly threatened Coen regarding The Shoe Department robbery.

Coen testified at trial in his own defense. He recounted that Miller talked to him about the planned robbery a couple of times, but Coen told Miller that he did not want any part of it. Yet, on June 26, 2009, Coen agreed to meet Miller in Harrisonville on the evening of the robbery. Miller and Coen went to a Wal-Mart to purchase bandanas and gloves for the robbery. After purchasing the items, Miller "told me that this is what we are going to do. You are already with me. No going back now, so do it. Just do the crime. Just do this robbery. It will be all right. Everything will be fine." Coen testified that he told Miller he did not want to rob the store, but Miller stopped his car near some storage units, the men changed into the matching clothing, Miller drove to The Shoe Department, where Miller—according to Coen— "forced me to do it." Miller carried the baseball bat and told Coen to take the tire iron as a weapon. Coen testified that they carried out the crime as described by Lee and Ephland. Coen testified that he felt threatened by Miller because of the history of Miller's bullying him. He stated that if he had not agreed to do as Miller said, he felt that "my life was in danger. I would have been in some type of physical altercation."

At trial, Coen acknowledged that in his written statement to law enforcement, he stated that he "needed money real bad" and that, although he claimed to be afraid of Miller, he implicated Miller in the robbery. Coen testified that Miller never actually threatened him with a weapon— instead equipping him with a weapon—and Coen never thought Miller would kill him. Instead, Coen found Miller's tone and demeanor threatening. Coen admitted that he had many opportunities before, during, and after the robbery to run away, but he chose to participate, keep the money, and immediately use it for his own purposes.

At the close of the evidence, Coen raised the defense of duress to both charges and

proffered instructions following MAI–CR3d 310.24:

## INSTRUCTION NO. ____

As to Count [ ], if you find and believe from the evidence beyond a reasonable doubt that the defendant engaged in the conduct submitted in Instruction No. ____, you will then decide whether or not at that time he acted under duress.

As to Count [ ], if you further find and believe that it is more probably true than not true,

First, that Dustin Miller threatened the imminent use of physical force against the defendant, and

Second, that this threatened use of force was such that a person of reasonable firmness in the defendant's situation would not have been able to resist, and

Third, that defendant was thereby coerced into engaging in the conduct submitted in Instruction No. ____, (and)

then you must find the defendant not guilty under Count [ ] by reason of acting under duress.

The trial court refused the instructions:

[T]here has to be the use of or the threat of imminent use of force as to corrosion [sic] for the duress instruction to be given. In this particular [case,] the Court doesn't believe that there is any evidence to support that. Furthermore, much of the case law discusses that you can't put yourself in the position of being in the circumstance that leads [to] the duress.

In this case we certainly heard evidence that the defendant has placed himself in the situation and made voluntary choices. Thirdly, the case law certainly suggest that you have to have—if you have a capacity to withdrawal [sic] from the situation then the duress instruction isn't inappropriate [sic]. We have heard

ample evidence yesterday that there were many opportunities for the defendant to withdraw. . . . I don't think there is a basis for its submission.

The jury found Coen guilty of both crimes and the trial court sentenced him to consecutive terms of ten years' imprisonment for first-degree robbery and three years' imprisonment for armed criminal action.

Coen appeals.

## Standard of Review

■ Our review of a trial court's refusal to submit a tendered jury instruction is limited to determining whether the trial court abused its discretion. *State v. McCabe*, 345 S.W.3d 311, 318 (Mo.App. W.D.2011). "A trial court abuses its discretion if the ruling is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* (internal quotation omitted).

## Analysis

■ The common law of duress was codified by statute effective January 1, 1979. *State v. Crenshaw*, 14 S.W.3d 175, 177 (Mo.App. E.D.2000). Duress is:

an affirmative defense that the defendant engaged in the conduct charged to constitute an offense because he was coerced to do so, by the use of, or threatened imminent use of, unlawful physical force upon him or a third person, which force or threatened force a person of reasonable firmness in his situation would have been unable to resist.

§ 562.071.1. "The coercion, to constitute a defense, must be present, imminent and impending, and of such a nature as to induce a well grounded apprehension of death or serious bodily injury." *State v. Lane*, 834 S.W.2d 242, 245 (Mo.App. W.D. 1992). The threat cannot be of some fu-

ture action. *Id.* The defense of duress is not available "[a]s to any offense when the defendant recklessly places himself in a situation in which it is probable that he will be subjected to the force or threatened force described in subsection 1." § 562.071.2(2). Likewise, "a person who has a reasonable opportunity to avoid the act [cannot] claim duress as a defense." *Lane,* 834 S.W.2d at 245.

■ Coen's testimony did not establish the defense of duress under section 562.071. The evidence in this case: (1) did not reflect coercion that would have reasonably induced apprehension of death or serious bodily injury to Coen had he declined to participate in the robbery with Miller; (2) did not reflect that Coen lacked a reasonable opportunity to avoid the criminal actions he participated in with Miller; and (3) *did* reflect that Coen recklessly placed himself in the position of succumbing to Miller's plan of robbing The Shoe Department.

Coen relies on *Crenshaw* to support his argument that he was coerced to assist Miller because Miller threatened him with the imminent use of physical force. However, *Crenshaw* is factually distinguishable from this case. Crenshaw was convicted of robbery in the first degree and sought a new trial based on the trial court's denial of his request to instruct the jury on the affirmative defense of duress. *Crenshaw,* 14 S.W.3d at 176. The robbery victim in *Crenshaw* testified that she, the aggressor, and Crenshaw were in her car when the aggressor held a gun to her head and demanded her belongings. *Id.* Crenshaw did nothing and said nothing. *Id.* As she was removing her jewelry, the aggressor pointed the gun at Crenshaw and demanded that Crenshaw collect the victim's belongings. *Id.* at 177. The aggressor then waved the gun at Crenshaw before placing it back against the victim's neck. *Id.* Crenshaw did not move or say

anything, only holding up his hands to receive her jewelry. *Id.* The victim testified that Crenshaw made no threatening gesture toward her and took no action until the aggressor pointed the gun at him; the victim simply placed her jewelry in Crenshaw's hand. *Id.* Crenshaw argued on appeal that he "made no threatening remarks or actions as he rode in [the victim's] car, and did not participate in the robbery until [the aggressor] pointed his gun at [Crenshaw] and ordered him to collect her belongings." *Id.* On appeal, the court found that duress is a submissible issue where the robbery is committed by a defendant under the "immediate surveillance" of another person armed with a weapon. *Id.* at 178 (internal quotation omitted). Because there was a substantial threat of the imminent use of a lethal weapon, the court found that the trial court erred in refusing to instruct the jury on the defense of duress. *Id.*

Here, the record refutes Coen's contention that he was under a similar threat of the imminent use of a weapon by Miller to coerce Coen to commit the crime. Coen was broke, had fines and other financial obligations to pay, and needed money the day of the robbery. Coen met Miller several days before the robbery and knew that Miller planned to commit the robbery. With this knowledge, Coen voluntarily had a friend drop him off in Harrisonville where Coen then voluntarily called Miller to pick him up *when he knew Miller planned to commit the robbery.* Miller did not threaten Coen with the threat of imminent physical harm if he refused to assist Miller in the crime and, instead, the uncontroverted evidence is that Miller actually *equipped* Coen with a weapon and assured Coen that "[i]t will be all right. Everything will be fine."

Additionally, at minimum, Coen recklessly placed himself in the situation he

now claims to have been subjected to duress. Coen testified that he had known Miller for three years and, during that time, Miller bullied him. Yet, Coen regularly and voluntarily "hung out" with Miller time after time, including his voluntary and conscious decision to have a friend deliver him to Harrisonville where he initiated a call to Miller to pick him up when *he knew Miller was planning to commit a robbery the two had discussed just days earlier.*

Finally, "a person who has a reasonable opportunity to avoid the act [cannot] claim duress as a defense." *Lane,* 834 S.W.2d at 245. Here, instead of avoiding Miller when he knew that Miller planned to commit a robbery and had talked to Coen about assisting in the robbery days earlier, Coen chose to find a ride from a friend to be dropped off in Harrisonville where he then called Miller to pick him up, accompanied Miller to a Wal–Mart to purchase bandanas and gloves for the robbery, accompanied Miller to storage units where they changed into matching clothing for the robbery, accepted a weapon (i.e., tire iron) from Miller in the parking lot of The Shoe Department, ripped out the cash register of The Shoe Department, fled the crime scene with Miller to Miller's escape vehicle, evenly split the stolen money with Miller, and immediately used his share of the money from the robbery to pay a fine associated with a marijuana charge, pay his rent, and pay a debt owed to a friend.

The evidence was clear that Coen participated in the robbery intentionally and voluntarily or he recklessly placed himself in the position of succumbing to the pressure of a friend he claimed to have a history of being physically intimidated by. Either way, Coen was not coerced into committing this crime; he voluntarily sought out the individual he knew was planning to commit the crime and had asked for Coen's assistance in doing so just days earlier. Even after the act of robbery was imminent, Coen had numerous reasonable opportunities to avoid participation but he chose to participate anyway. Based on this record, we cannot conclude that the trial court abused its discretion in refusing Coen's proffered duress instructions.

## Conclusion

The judgment of the trial court is affirmed.

VICTOR C. HOWARD, Presiding Judge, and KAREN KING MITCHELL, Judge, concur.