STATE of Missouri, Respondent,

v.

Karen Diane CUMMINGS, Appellant.

WD 79288

Missouri Court of Appeals,
Western District.

OPINION FILED: March 28, 2017

John Bragg, Independence, MO, Counsel for Appellant

Rachel Flaster, Jefferson City, MO, Counsel for Respondent

Before Division One: James Edward Welsh, P.J., Anthony Rex Gabbert, and Edward R. Ardini, Jr., JJ.

James Edward Welsh, Presiding Judge

Karen Diane Cummings appeals the circuit court's judgment convicting her following a jury trial of one count of the class D felony of unlawful use of a weapon. We affirm the circuit court's judgment.

## Background

The State charged Cummings with violating section 571.030.1(4), RSMo,[1] on or about December 1, 2014, by knowingly exhibiting, in the presence of one or more persons, a weapon readily capable of lethal use, in an angry or threatening manner.

The evidence at trial showed that,[2] at the time of the charged crime, Cummings'

---

1. Statutory references are to the Revised Statutes of Missouri (RSMo) 2000, as updated by the 2013 Cumulative Supplement and the 2014 Non–Cumulative Supplement.

2. We present the evidence in the light most

friend, Brenda Weigand, was in the midst of a divorce from Danny Weigand. Danny lived in the couple's home, which was on a farm. Brenda no longer lived there.[3] On December 1, 2014, Brenda wanted to get some hay for her horses. She texted Danny to let him know that "she wanted to come and get some hay from the farm." Danny responded that, "it needed to go through [their] lawyers." Danny testified that he and Brenda had had some confrontations during the divorce, and he expected that, if she came over to get hay, there would be problems.

Nevertheless, Brenda called Cummings and asked if she would go with her to the farm, as she needed help loading the hay and because she was scared to go by herself. Cummings agreed, and the two women drove to the farm in the Weigands' Dodge pickup. When they arrived, Brenda found the tractor she would need to load the hay, but the keys were not in it.

Danny, who was in the barn, saw Brenda and Cummings pull into the driveway. He got into his feed truck and drove to meet them. Danny pulled up next to Brenda, who was walking toward the couple's other truck, a Ford pickup, which was parked at the farm. Danny asked Brenda what she was doing, but she did not answer. When Danny tried to get out of the feed truck, Brenda "slammed the door back on [him] and took off running towards" the Ford. Danny followed her. Danny and Brenda both tried to get the keys out of the Ford. Brenda got them first, and an altercation ensued. Danny asked for the keys, but Brenda refused to relinquish them unless Danny gave her the

tractor keys so she could get some hay. He refused.

Danny turned and began to walk back toward the Dodge that Brenda had been driving. By this time, Cummings "had c[o]me down towards" the Ford. Danny walked past Cummings on his way to the Dodge. Danny was "trotting" "to make sure [Brenda and Cummings] weren't running behind [him]." He wanted to get to the Dodge first to get the keys. Cummings called out Danny's name a couple of times, but he ignored her. Cummings then pulled out her pistol and chambered a round, thinking that the sound would get his attention. It did not. When Danny got to the rear of the Dodge pickup, he heard the sound of a gunshot, which startled him. He turned around and saw Cummings standing there holding a gun "kind of up in the air."

Danny took the keys out of the Dodge and "started walking back." Cummings came toward him and met him. She still had the gun in her hand. According to Danny, "the gun was out to her side kind of like a 45–degree angle." Cummings told Danny, "a little forceful[ly]," to give her the keys. Danny looked at her for a few seconds. He "really didn't know what was going to happen" and felt threatened. Danny then turned and walked away from Cummings. As he walked toward the barn, he called 911 on his cell phone.

Johnson County Sheriff's Deputy William Holland was dispatched to the farm. When he arrived, he found Cummings and Brenda sitting in a pickup truck. Deputy Holland asked Cummings if she had a firearm, and Cummings gave him a .45 Kimber handgun. Deputy Holland found a

favorable to the jury's verdict. *State v. Taylor*, 298 S.W.3d 482, 491 (Mo. banc 2009). In addressing Point II, we must view the evidence in the light most favorable to giving an instruction on defense-of-another; thus, we

include additional facts there in connection with that analysis.

3. We refer to the Weigands by their first names for the sake of clarity and brevity.

spent .45 shell casing in the area where the firearm had been discharged. The deputy testified that Cummings told him she had pulled out her pistol and "racked the gun" hoping that the sound would scare Danny into giving the keys back, but, instead, he kept walking "with a crazy look in his eyes." When the sound of chambering the pistol did not get Danny's attention, she pointed the gun in the air and discharged it.

The jury found Cummings guilty of unlawful use of a weapon and assessed punishment as "[n]o imprisonment but a fine, in an amount to be determined by the court." The court sentenced Cummings to pay a $100 fine.

## Discussion

**In Point I**, Cummings contends that the circuit court erred in rejecting her claim, which she first raised in a motion for new trial, that the jury's inquiry as to whether Cummings had a conceal and carry permit was evidence of juror misconduct. Cummings claims that the inquiry alone demonstrated that the jury impermissibly considered "material matters extrinsic to the evidence and outside of the issues at trial" and, thus, necessitated a new trial.

Prior to trial, the court granted defense counsel's motion *in limine* to exclude any evidence related to a concealed carry permit. During deliberations, the jury sent a note asking, "Did or does [Cummings] have a conceal and carry permit and does she have any weapons training?" The court discussed the matter with the attorneys, and all agreed that the court would respond: "I cannot provide you with the information you have requested. You will be guided by your collective memories of

the evidence." Defense counsel stated: "That is fine, Judge."

 By not addressing this alleged misconduct when she witnessed it, Cummings failed to preserve this claim for review. *State v. Cooper*, 735 S.W.2d 85, 86 (Mo. App. E.D. 1987) ("A party cannot witness jury misconduct or improper influences on the jury and wait until after the verdict before deciding if he will object."). Thus, the claim can be reviewed for plain error only. *State v. Walter*, 479 S.W.3d 118, 123 (Mo. banc 2016). In the context of plain error review, we will reverse the denial of a motion for new trial only if we find "an obvious and clear abuse of discretion, which affected a substantial right of the appellant and resulted in manifest injustice or miscarriage of justice." *State v. Stephens*, 88 S.W.3d 876, 881 (Mo. App. W.D. 2002).

 When a defendant moves for a new trial based on juror misconduct, she has the burden to show that misconduct occurred, after which the burden shifts to the State to show that the jurors were not subjected to improper influences. *See State v. Smith*, 944 S.W.2d 901, 921 (Mo. banc 1997). Before the burden shifts, however, juror misconduct *must be established*; factual allegations in a motion for new trial are not self-proving. *Id.*

Cummings apparently did not attempt to establish the misconduct that she alleged in her new trial motion.[4] She claims, however, that, after a case has been submitted, the *opportunity* for improper influence "alone" mandates a new trial, citing *State v. Dodson*, 338 Mo. 846, 92 S.W.2d 614, 615 (1936) (held that the defendant was entitled to an automatic new trial due to the mere *opportunity* for improper in-

---

4. The State asserts that Cummings offered no proof of juror misconduct at the motion for new trial, and Cummings does not dispute that. We have not been provided a transcript of the hearing on the motion for new trial.

fluence where jurors were separated during deliberations). As noted in *State v. Kelly*, however, the ruling in *Dodson* "has been expressly repudiated by the Missouri Supreme Court." 851 S.W.2d 693, 695 (Mo. App. E.D. 1993) (citing *State v. Babb*, 680 S.W.2d 150, 151–52 (Mo. banc 1984); § 547.020).

Neither *Dodson* nor any of the other cases Cummings cites are helpful to her. In *Smith*, where the appellant claimed juror misconduct based on a juror's failure to disclose pertinent information during *voir dire*, the Supreme Court noted that the defendant did not address the issue of juror misconduct at a hearing but, instead, "rel[ied] solely on the conclusory allegation[s]" in the new trial motion. 944 S.W.2d at 921. The *Smith* Court rejected the claim on the basis that, without relevant evidence of misconduct, "the trial court could not evaluate" whether or not such misconduct existed. The same is true here. All of Cummings' other cited cases are distinguishable, in that, in each, a juror actually independently gathered and considered information extraneous to the trial.[5] Here, Cummings' claim of juror misconduct is based solely on the jury's question to the court during deliberations, and Cummings did not raise a claim of juror misconduct at that time (or at any time prior to the verdict). We cannot allow a litigant to remain silent when aware of claimed misconduct and gamble on the outcome of the case.

In any event, the trial court repeatedly instructed the jurors that they must decide the case "only by the evidence presented in the proceedings in the courtroom" and, in response to their inquiry, to be "guided by [their] memories of the evidence." It is axiomatic that jurors are presumed to follow the court's instructions. *See, e.g., State v. Shurn*, 866 S.W.2d 447, 465 (Mo. banc 1993). We will not presume that the jury failed to do so merely because it asked a question.

In sum, we do not find that the trial court's ruling "was an obvious and clear abuse of discretion, which affected a substantial right of the appellant and resulted in manifest injustice or miscarriage of justice." *See Stephens*, 88 S.W.3d at 881.

Point I is denied.

■ **In Point II**, Cummings argues that the circuit court erred in submitting Instructions No. 5 and 6 (referring to "defense of another"), over her objection, because the defendant bears the burden of injecting that issue at trial, and she did not do so. Cummings claims that she was prejudiced because the submission of those instructions required her "to literally defend against those issues she never raised in the first place nor presented any evidence to address."

In short, Instructions No. 5 and 6 required that,[6] in order for the jurors to find

---

5. *See Smotherman v. Cass Reg'l Med. Ctr.*, 499 S.W.3d 709 (Mo. banc 2016) (held that juror's consideration of information gathered extraneous to the trial was juror misconduct, but was not prejudicial); *Travis v. Stone*, 66 S.W.3d 1 (Mo. banc 2002) (judgment reversed and remanded due to prejudicial juror misconduct where juror considered information independently gathered outside of trial); *Middleton v. K.C. Pub. Serv. Co.*, 348 Mo. 107, 152 S.W.2d 154 (1941) (same); *Stephens*, 88 S.W.3d 876 (held that presumption of prejudice from proof of misconduct, where juror

independently obtained extraneous evidence, was sufficiently rebutted; held that trial court did not plainly err in overruling defendant's motion for a new trial).

6. The pertinent provision in Instruction No. 5 stated: "Fifth, that defendant did not act in lawful defense of another as submitted in Instruction No. 6[.]" Instruction No. 6 stated, in pertinent part, that:

One of the issues in this case is whether the use of force by the defendant against Danny

Cummings guilty, they had to find that she did not act in lawful defense of Brenda. At the instruction conference, defense counsel objected to the instructions, which were tendered by the State, on grounds that the defense had not raised the defense-of-another issue or presented evidence to support it. The prosecutor argued for submission of the instructions, asserting that, because the defense had been "injected" into the case, "I think they need to be given." The trial court noted that there was testimony "that the defendant believed she pulled the gun out ... to de-escalate the situation [and] that she had seen and/or heard of other events where the husband had been abusive or physical with wife." The court opined that "without that instruction I would be afraid [that] if the State objected during closing when the defense started arguing [that], I would have to sustain that objection." After defense counsel assured the judge that he was, indeed, "going to argue that," the court responded: "[I]f that's going to be argued, I think the jury has to see that [instruction] or else the jury would have no other choice but to find her guilty and I don't think that would be fair to anybody." The court ultimately overruled defense counsel's objections and submitted Instructions No. 5 and 6 to the jury.[7]

---

Weigand was lawful. In this state, the use of force, including the use of deadly force, to protect another person is lawful in certain situations.

....

In order for a person lawfully to use non-deadly force in defense of another person, such a defender must reasonably believe such force is necessary to defend the person he is trying to protect from what he reasonably believes to be the imminent use of unlawful force.

But a person acting in the defense of another person is not permitted to use deadly force unless he reasonable believes the use of deadly force is necessary to protect the person against death or serious physical injury.

....

7. Following is the relevant evidence, as compiled in Cummings' brief:

[Brenda testified that, as she was leaning over into the Ford truck to remove the keys,] Danny Weigand came in from behind and jumped on top of Brenda Weigand while she was trying to get the keys, which according to Brenda Weigand shoved her forward and shoved her head into the steering wheel of the pickup. According to Brenda Weigand, she pulled the keys out and stuck them in her pocket and at the time, he had his arms around her squeezing very, very tightly.

According to Brenda Weigand, he pulled her out of the truck, and her feet were not on the ground, and [he] was trying to get into her pocket to get the keys, and she said, "Leave me alone, put me down, let me get my hay." Brenda Weigand was yelling in a very loud voice. It was Brenda Weigand's opinion from her observation and watching Danny Weigand that he was very angry, very psychotic, just out of his mind with anger and madness and very much a bully.

According to Danny Weigand, he leaned in the [red Ford truck] trying to reach in around [Brenda], trying to reach the keys out of the ignition first. She told him, "Get off of me." Danny Weigand wasn't going to let her take the keys out of his truck (the red Ford truck). Danny Weigand was then asked: "Did you see her head bang into the steering column, did you see that happen?" Answer, "No." Question: "You didn't see it or it didn't happen?" Answer: "I don't recollect it happened." Brenda Weigand got the keys to the truck (red Ford pickup).

[Cummings] ... saw all of that happening and got out of the [Dodge] truck. When she heard Brenda scream and yell, "Get off of me," she went walking down there and was standing to the back of the [Ford] truck ... and he was still on [Brenda]. After Danny Weigand let go of [Brenda], he kind of stammered around and then walked toward [Karen Cummings] and at that point Karen said, "Dan, just give her the tractor keys." Danny Weigand glared at Karen, walked past her and appeared to be very angry. He got about five feet from Karen and he started jogging (towards the [Dodge] truck) and Karen said, "Dan, stop." [H]e kept going and she said, "Dan, stop."

■ Like self-defense, defense of another is a "justification" defense.[8] *See State v. Newberry*, 157 S.W.3d 387, 397 (Mo. App. S.D. 2005). When reviewing a claim of error related to instructing on a justification defense, "we view the evidence in [the] light most favorable to the defendant." *State v. White*, 222 S.W.3d 297, 300 (Mo. App. W.D. 2007). Whether a justification defense has been raised by the evidence is a question of law. *State v. Kasparie*, 498 S.W.3d 804, 811 (Mo. App. S.D. 2015). We review questions of law *de novo. Newberry*, 157 S.W.3d at 397.

■ A justification defense instruction must be given when "substantial evidence" has been presented to support it. *State v. Avery*, 120 S.W.3d 196, 200 (Mo. banc 2003). " 'Substantial evidence' is evidence putting a matter in issue." *Id.* The evidence may come from the defendant's evidence, from evidence presented by the State, or through the testimony of a third-party. *Id.* at 201; *Stiers v. State*, 229 S.W.3d 257, 262 (Mo. App. W.D. 2007). Moreover, the instruction must be given even if the evidence supporting the defense is inconsistent with the defendant's testimony or theory of the case and regardless of whether the defendant requested it. *Kasparie*, 498 S.W.3d at 810-11 (citing *Avery*, 120 S.W.3d at 203). Failure to

---

Karen Cummings had been told about multiple times where similar incidents have happened during this marriage and she was aware of that. Karen Cummings had also seen similar incidents between Danny and Brenda Weigand twice before at her place, one in October of 2014 just a little less than two months earlier where he had grabbed her and was tossing her around, and there were some bruises on her arms that resulted from that. Prior to that occasion, Karen Cummings had seen a physical altercation between Danny Weigand and Brenda Weigand and they had gotten into an argument again and he had grabbed her. Karen Cummings knew how Danny Weigand had previously reacted to Brenda and he was very mad and very upset on both of those occasions.

Karen Cummings felt that the situation was escalating and with the look in his eye didn't know what his plan was next and he was starting to jog back to the east towards the silver truck (with his back to Karen Cummings).

After she called his name a couple of times and he didn't pay attention, she pulled her pistol out and chambered it thinking when she chambered it, the sound of that would maybe get his attention. That did not get his attention, so she pointed her gun in the air and shot off one round which made a loud noise. Mr. Weigand stopped and things seemed to cool down at that point.

In addition, as pointed out by the State, Brenda testified that she asked Cummings to go with her to get the hay because she "was scared to go by [herself]." Also, Cummings' father testified that he had seen Danny "manhandle" Brenda and that Brenda "had big bruises on her arms the next day as a result of this."

8. Pursuant to section 563.031.1, "[a] person may ... use physical force upon another person when and to the extent [she] reasonably believes such force to be necessary to defend ... a third person from what [she] reasonably believes to be the use or imminent use of unlawful force by such other person, unless[, *inter alia*,] [t]he actor was the initial aggressor. ..." Under 563.031.2, a person may use "deadly force" to protect another person only if she "reasonably believes that such deadly force is necessary to protect ... another against death, serious physical injury, or any forcible felony." The Missouri Supreme Court has held that unlawful use of a weapon by exhibiting it in an angry or threatening manner constitutes "deadly force" for purpose of such justification defenses. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992) (a defendant charged under § 571.030.1(4) is "entitled to an instruction on self-defense if the facts justify the use of deadly force"); *accord State v. Rogers*, 976 S.W.2d 529, 533 (Mo. App. W.D. 1998); *State v. Powers*, 913 S.W.2d 138, 141 (Mo. App. W.D. 1996); *see also State v. Miller*, 91 S.W.3d 630, 634 n.2 (Mo. App. W.D. 2002) ("*Parkhurst* stands for the proposition that exhibiting a firearm in an angry and threatening manner constitutes deadly force as a matter of law.").

submit an instruction on a justification defense that is supported by the evidence constitutes reversible error. *Avery*, 120 S.W.3d at 200.

Here, evidence was elicited which put at issue whether Cummings exhibited her gun to defend Brenda from the use or imminent use of unlawful force by Danny. Viewed in the light most favorable to the defendant, the evidence showed that Danny had a history of physically harming Brenda; that he appeared to be "[v]ery angry, and very psychotic, just out of his mind with anger and madness"; that he then "started running"; and that Cummings "didn't know what his plan was next." There also was evidence from which the jury could have inferred that Danny was the initial aggressor. Thus, the trial court properly submitted the defense-of-another instructions. To do otherwise would have constituted reversible error. *Avery*, 120 S.W.3d at 200.

It is irrelevant that Cummings objected to the instructions. If a justification defense is injected into the case by *any* evidence, the judge must instruct, *even if the defendant does not desire* such an instruction. *See State v. Williams*, 828 S.W.2d 894, 900 (Mo. App. E.D. 1992), *abrogated on other grounds by State v. Hardin*, 429 S.W.3d 417 (Mo. banc 2014). In *Williams*, the trial court overruled the defendant's objection to a self-defense instruction which the defendant claimed was not supported by the evidence and was prejudicial to him. *Id.* The appellate court found no error in submitting the instruction and no prejudice, stating:

[A] defendant has no burden on the issue of self-defense. *Once the issue of self-defense has been raised, from whatever source, the burden rests on the State as an element of conviction to prove beyond a reasonable doubt that the homicide was not justified.*

Thus it was not error for the trial court to submit the self-defense instruction over Defendant's objections.

*Id.* (emphasis added) (internal citations omitted).

■ As *Williams* demonstrates, Cummings was not forced to "defend a burden which [she] chose not to assert," as she claims. A justification defense is a "special negative defense," meaning that, once injected by the evidence, the *State* has the burden to disprove the defense. *See Jones v. State*, 495 S.W.3d 789, 791 (Mo. App. E.D. 2016); § 563.031.5. Cummings was not prejudiced by these instructions, as they did not require her to bear any burden of proof, and the jury was properly informed of that fact.

In sum, the circuit court did not err in submitting Instruction Nos. 5 and 6 to the jury, and Cummings did not suffer any prejudice from them.

Point II is denied.

■ **In Point III,** Cummings contends that the circuit court erred in denying her motion for new trial because "the verdict was against the weight of the evidence in that there was no substantial evidence that [she] exhibited a pistol in a threatening manner." As the State correctly points out, an appellate court "cannot reverse a defendant's conviction because the verdict is against the weight of the evidence." *State v. Jerelds*, 637 S.W.2d 80, 81 (Mo. App. E.D. 1982). "The weight of the evidence is for the jury in the first instance, and may be considered by the trial court in ruling on the motion for new trial, but it is not a matter reviewable by an appellate court." *Id.* (citing *State v. Morgan*, 453 S.W.2d 932, 934 (Mo. 1970)).

Given that we are precluded from reviewing this claim of error, Point III is denied.

## Conclusion

For the foregoing reasons, we affirm Cummings' conviction and sentence.

All concur.